WAYNE ROBERT FELDE *v.* STATE OF MARYLAND

[No. 501, September Term, 1974.]

*Decided May 2, 1975.*

The cause was argued before THOMPSON, GILBERT and MOORE, JJ.

*Allan P. Feigelson, Assigned Public Defender,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Gary Melick, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County* and *John B. Wynes, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

The principal contention presented on this appeal is that the trial court erred by applying the *prima facie* standard of proof in making a judicial determination of voluntariness concerning appellant's custodial confession to the fatal shooting of a fellow construction worker on November 28, 1973. Upon our review of the record, it is plain that the court did not find the inculpatory statement admissible by a preponderance of the evidence but did indeed apply the lesser standard of *prima facie* proof. We therefore reverse the judgment of conviction and grant appellant a new trial.

Appellant, Wayne Robert Felde, age 24, was indicted for the murder of William Blackwell, age 21, and for assault with intent to murder and/or assault upon four officers of

the Prince George's County Police Department. He was tried by a jury in the Circuit Court for Prince George's County, the Honorable William H. McCullough presiding, and was found guilty of second degree murder and four counts of assault. The court sentenced him to a 15-year term on the second degree murder conviction and five years each on the lesser offenses, to run concurrently.[1]

The events leading up to the appellant's making a full and damaging statement to the police on the evening of November 28, 1973, could be found to have transpired in the following manner: at approximately 10 p.m., the police responded to 8539 Greenbelt Road to investigate reports of a fight and sounds of gunfire. When they arrived at the apartment building, a woman later identified as appellant's wife, informed the officers that "her husband had been involved in a fight with a man and that she had heard a shot and she thinks somebody had been shot."

The appellant appeared briefly outside his apartment with a carbine in his hand but quickly withdrew. He then fired shots through the upper part of the door and issued a warning to the police officers: "[D]on't come through the door. I will show you what Vietnam is like." After the arrival of his mother on the scene, however, he threw out the rifle and surrendered. While being handcuffed, he remarked to the police: "You don't have to worry about him. I blew his head off. He is in my bedroom closet dead." Police Corporal Fox immediately advised him of his rights and appellant said he did not wish to make a statement. He was then transported to the office of the Bureau of Criminal Investigations in Forestville where the inculpatory statement at issue was taken by Detective James Wiseman.

At the trial, out of the presence of the jury, Detective Wiseman testified [2] that he first read appellant the *Miranda*

---

1. This is a belated appeal by order of Judge Samuel W. H. Meloy following appellant's petition for relief under the Post Conviction Procedure Act.

2. Seven other detectives who had responded to the police call to appellant's apartment preceded Detective Wiseman to the stand. Their testimony was in the jury's presence. It appears from a colloquy at the

warnings [3] from a card issued by the State's Attorney's office and waivers of his rights on the reverse side, to which appellant acquiesced. Detective Wiseman then obtained a police department "long" waiver of rights form and again read it to the appellant. The latter signed the form and initialed it in several places. The statement, taken while appellant was handcuffed, consisted of 19 questions and answers and was typed "verbatim" by the detective during the half-hour period from 11:20 p.m. to 11:50 p.m., at the close of which appellant read over his statement and signed it. Detective Wiseman testified that although the appellant had been drinking during the day, he was not drunk and his speech was not slurred at the time of the interrogation. He also stated that no methods of coercion or intimidation were employed.

At the beginning of the statement appellant declared: "What happened is he got shot and I shot him." The following questions and answers thereafter appear concerning the shooting:

"Q. Why did you shoot Butch?

A. He was fighting with me in my own apartment. My wife was there but she ran out in front."

* * *

"Q. Why were you and Butch fighting?

A. We just had a disagreement, nothing really. It was just a disagreement.

Q. How did the man, Butch, get shot?

A. We were wrestling over my rifle and I told him to leave my home and he got shot. He would not leave so he got shot.

Q. How far were you from Butch when he got shot?

---

bench requested by defense counsel, that an unreported motion was made to exclude the jury, for the purpose of appellant's motion to suppress, when Detective Wiseman took the stand.

3. Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

A.  About two or three feet. We were in my closet in the bedroom."

          \* \* \*

"Q.  What kind of gun did you use to shoot Butch with?

A.  It was an M1 Carbine, .30 caliber, and the bullet consisted of 110 grains. That is the only bullet I have in my house. The rifle is used for deer hunting only.

Q.  When did you load the rifle?

A.  The rifle has always had its magazine inside of it but it is not chambered though.

Q.  Did you put the bullet up in the chamber?

A.  I am not sure. I pulled the trigger. Yes, sir, I did that.

Q.  What happened after Butch got shot?

A.  I dared the police to walk through the door.

Q.  Why did you do this?

A.  Because I knew they wouldn't."

          \* \* \*

"Q.  How much education do you have?

A.  I have about a year of college.

Q.  How much have you had to drink today?

A.  About nine beers (12 ounce beers)."

The appellant testified, out of the presence of the jury, and said that he "was very drunk, intoxicated, shaken up and scared" at the time he was questioned. He did not remember talking to Detective Wiseman but did recall a "Detective Nelson filling out a report," during which time,

"I kept trying to doze off and he kept waking me up and telling me that I would remain awake until the report was finished and I kept still dozing off because I was dazy, and I remember him going to

his desk and taking a blackjack out, putting it in his back pocket. I was never struck with this blackjack and not threatened with it, but it was put in his back pocket, taken out of his desk, and I think it was more or less to scare me."

He also testified that he and the deceased, co-workers on a construction site in Suitland, had been drinking beer together, in a sojourn from bar to bar, since two o'clock in the afternoon when their workday unexpectedly ended. On cross-examination, while admitting that his signature and initials were on the statement, appellant testified that he did not recall having made the statement: "What happened is he got shot and I shot him." He did remember, however, that he and the deceased were wrestling over his [appellant's] gun.

Mrs. Ruby Felde, the appellant's mother, also took the stand at the suppression stage and testified that she had gone to her son's apartment on the evening of the "murder" because of his telephone plea shortly after 9 p.m.: "Mama, get help. I think I killed a man." Mrs. Felde arrived at the scene and witnessed her son leaving his apartment in a condition she described as "staring like a wild man" and "drunk." As he was placed under arrest, her son said to her, while crying: "I think I killed a man. I couldn't help it. Mama, I couldn't help it." Mrs. Felde testified that she saw her son in Forestville later that evening where "he was still drunk" and "still acted like he did not know what he was doing." She was a registered nurse who had worked for 9 years in the emergency room at Prince George's Hospital where she treated a "lot of alcoholics" and "drug addicts."

After hearing argument on the motion to suppress, during which counsel stated that the standard to apply was that of the preponderance of the evidence, the court announced:

"The Court has to decide whether or not the *prima facie* proof in this matter as to this time establishes that the confession was voluntarily, freely made, and in this instance, the issue is really was the defendant in this case so drunk at the time

he made the confession that he did not know what he was doing, simply put."

After reviewing the evidence, the court concluded that *"the State has met its burden, prima facie and has prima facie shown* that the statement given by this defendant was given freely, voluntarily and with a rational mind." (Emphasis added.) The jury then returned to the courtroom and the trial resumed with Detective Wiseman's testimony and the receipt in evidence of appellant's statement.

The first "major point" made by appellant's trial counsel in support of a motion for a new trial was that the court had applied an improper standard of proof — the *prima facie* test instead of the preponderance of the evidence test — in its determination of the admissibility of appellant's inculpatory statement. Reliance was placed specifically on *Lego v. Twomey,* 404 U. S. 477 (1972). Denying the motion for a new trial, the court stated:

"The Court ruled at the trial that the test was whether the *prima facie* proof· was such as to establish that the confession was freely and voluntarily made. In light of counsel's argument to me *I still feel that is the test.* I ruled at the time that there was *prima facie* proof that the statement was freely and voluntarily made." (Emphasis added.)

And, the court immediately repeated:

"I reviewed the evidence at the time . . . 1 see no reason to reiterate what I said then. *I still believe the proper test was prima facie and it was met by the State,* and the statement made by the defendant was admissible." (Emphasis added.)

The court, in so holding, made no reference to *Lego v. Twomey, supra,* where the Supreme Court divided four to three against petitioner's contention, upon the authority of *In re Winship,* 397 U. S. 358 (1970), that the trial judge should have found the confession voluntary *beyond a*

*reasonable doubt.*[4] (Emphasis added.) Mr. Justice White, who had authored the majority opinion in *Jackson v. Denno,* 378 U. S. 368 (1964), stated for the majority in *Lego* that in the resolution of the issues presented "we must return to *Jackson v. Denno.* . . ." There the Court had held that:

(a) There is a denial of due process if a defendant's conviction is based, in whole or in part, upon an involuntary confession; and

(b) That whether there is ample evidence aside from the confession to support the conviction is immaterial; and

(c) That there is a constitutional right to object to the use of a confession and to have a fair hearing and a "reliable determination" of voluntariness, a determination which must be uninfluenced by the truth or falsity of the confession.

That the trial judge at a coercion hearing was not constrained by the Court in *Jackson v. Denno* to determine voluntariness with reference to an "especially severe standard of proof" was noted by the majority in *Lego.* On the other hand, that the less stringent standard of *prima facie* proof may not be utilized was made abundantly clear (p. 489):

> "Thus, the prosecution must prove *at least by a preponderance of the evidence* that the confession was voluntary. Of course, the States are free, pursuant to their own law, to adopt a higher standard." (Emphasis added.)

The trial in the instant case took place on May 8 through May 10, 1973. *Lego* was decided on January 12, 1972, and clearly represented the controlling law at the time of the

---

4. Mr. Justice Powell and Mr. Justice Rehnquist took no part in the consideration or decision of the case. Mr. Justice Brennan filed a dissenting opinion in which Justices Douglas and Marshall joined, urging that the standard of proof beyond a reasonable doubt should be applied.

decision below. This Court had occasion thereafter in *Mulligan v. State*, 18 Md. App. 588, 308 A. 2d 418, decided on August 10, 1973, to comment, in the light of *Lego*, upon the standard of proof required of the State at a suppression hearing as a condition of the admissibility of an incriminatory statement. Judge Gilbert, speaking for the Court, emphasized that: "Trial Judges should not only apply the preponderance of evidence test to confessions . . . but they should . . . shun the use of the words *prima facie* in connection with the degree of proof required . . . to render a confession admissible."

Here, the preliminary determination was unequivocally made by application of the standard of *prima facie* proof, rather than at least the test of preponderance of the evidence.[5] Felde's constitutional right to have the question of voluntariness preliminarily determined by the trial judge, *Jackson v. Denno, supra,* was violated. The judgment of conviction must be reversed.

In view of our holding, we do not consider other questions presented.

> *Judgments reversed; cause remanded for a new trial; costs to be paid by Prince George's County.*

---

5. The preliminary decision by the court involves a mixed question of law and fact. The trier of facts has, of course, the final determination whether or not the statement was voluntary and whether or not it should be believed. This ultimate determination by the trier of facts is a question of fact and the confession must be found voluntary by the standard of proof beyond a reasonable doubt. Ralph v. State, 226 Md. 480, 174 A. 2d 163 (1961); Linkins v. State, 202 Md. 212, 96 A. 2d 246 (1953); Barnhart v. State, 5 Md. App. 222, 246 A. 2d 280 (1968); Dempsey v. State, 24 Md. App. 8, 330 A. 2d 204 (1974).