422 So.2d 370 (1982)
STATE of Louisiana
v.
Wayne Robert FELDE.
No. 81-KA-0998.
Supreme Court of Louisiana.
October 18, 1982.
Rehearing Denied December 17, 1982.
*375 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Paul J. Carmouche, Dist. Atty., R. Cody Mayo, Edward E. Roberts, Jr., Dale G. Cox, Asst. Dist. Attys., for plaintiff-appellee.
Nathaniel Graves Thomas, Shreveport, for defendant-appellant.
WATSON, Justice.
Defendant, Wayne Robert Felde was convicted of first degree murder. LSA-R.S. 14:30.[1] The jury unanimously recommended a death sentence on the ground of one aggravating circumstance: the victim was a peace officer engaged in his lawful duties. LSA-C.Cr.P. art. 905.4(b).[2] Defendant has appealed and assigns fifty errors by the trial court.

FACTS
Felde, convicted of manslaughter and assault in Maryland, was serving a twelve year sentence when he escaped from a minimum security job and hitchhiked to his mother's home in Grand Cane, Louisiana. Felde then visited other states but returned to Louisiana because of his mother's terminal cancer. He was accompanied by two Colorado friends, Larry Hall and Cheryl McKenzie. At his mother's dying request, Felde abandoned an alias, Harold "Harry" Hershey, and worked under his real name in Shreveport, Louisiana. His mother died on October 13, 1978.
On October 20, 1978, Felde's sister, Florence McDonald, told him the police were looking for him. She drove Felde, Hall and McKenzie to Lorant's Sporting Goods in Shreveport where Felde purchased a .357 Magnum gun and a box of shells. With the loaded gun in his waistband, Felde was dropped off at the Pizza Inn on Highway 171. Larry Hall and Cheryl McKenzie were supposed to get his things and pick him up at the parking lot behind the pizza place. Felde stayed awhile at the Pizza Inn and then went next door to the Dragon Lounge. He waited in vain about six hours and drank enough beer to get "pretty loaded". (Tr. 2118) He finally asked that a taxi be called. Because a customer reported there was someone at the Lounge with a gun, two officers arrived in separate vehicles. While they were frisking another customer, Felde was following the taxi driver outside. After being told Felde was the man with the gun, officers Norwood and Thompkins searched him but did not discover the pistol.
The taxi driver refused to carry Felde because of his intoxication, and officer Thompkins arrested him as a simple drunk. Felde's hands were handcuffed behind his back and he was placed in the rear seat of Thompkins' police car. While Felde was being driven in the police car, William David Sweet, in another car, observed Felde up close behind the front seat. Felde was leaning forward on the right hand side of the driver. The officer put on his brakes and simultaneously made a motion to push Felde back in the seat. Felde said he was trying to shoot himself when he was pulled forward and pushed back. A shot was fired. There was testimony that the car filled with smoke. Felde did not remember anything after the first explosion. There were three other shots, leaving Felde with at least one bullet in his gun. The vehicle swerved against a guard rail and stopped. Thompkins staggered out of the car across the road before collapsing dead in a ditch.
*376 Felde ran slowly away, pausing before he crossed the street, and disappeared in an automobile lot. Shortly afterward, the police discovered Felde in a nearby residential area up against a fence. Officer Humphrey told Felde to freeze. Felde crouched on the ground, brought his hands up and held a gun in a shooting position. Officer McGraw told him to drop it and then fired a shotgun at Felde twice: twelve buckshot pellets were fired in each blast.[3] Felde, still handcuffed but with his hands in front of him, curled up on the ground in a fetal position.[4] His .357 Magnum gun was in a cocked position and fully loaded.
Dr. Robert E. Braswell, the Caddo Parish coroner, conducted the autopsy on Officer Thompkins, who died of a gunshot wound in the right lower back which entered at a downward angle of forty-five degrees. The bullet fragment hit the twelfth rib, grazed the right kidney, and then hit the vena cava and the aorta, before lodging in the abdominal wall. Another bullet which entered on the right side at approximately the same angle would not necessarily have been fatal. At least one bullet went through the roof of the car.
Felde was treated for gunshot wounds to the chest, abdomen, and lower extremities; abdominal abscess; fracture of the left tibia; fracture and gunshot wound in the right ankle; perforations of the stomach, small bowel, right colon, Sigmoid colon, right kidney, right lobe of the liver, spleen, and pancreas; and acute renal failure. Surgery was performed, including: an exploratory laparotomy; a splenectomy; removal of part of the liver; a right colectomy; right nephrectomy; suture of perforations of the stomach and small bowel; drainage of the pancreas; a left Sigmoid colostomy; and a shunt in the left ankle.
Because Felde pleaded not guilty and not guilty by reason of insanity, the court, on motion of the state, appointed Dr. Braswell and two psychiatrists, Dr. R. Fred Marceau and Dr. Norman Mauroner, to a sanity commission. LSA-C.Cr.P. art. 650.[5] All agreed that Felde was competent to stand trial and sane at the time of the offense, able to tell right from wrong. At trial, Felde was enrolled as co-counsel. The defense was insanity at the time of the crime; defendant allegedly suffered a post-traumatic stress syndrome as the result of combat in Vietnam.
Dr. Fred Marceau, a former member of the faculty at the L.S.U. Medical School in the field of psychiatry, saw Felde on January 31, 1979. Felde cooperated with Marceau during the hour and fifteen minute sanity commission interview. Dr. Marceau estimated that Felde was in the moderate range of intoxication at the time of the shooting. Dr. Marceau testified that there is a condition known as chronic or delayed post-traumatic stress disorder which can start six months from the traumatic event. Military combat can cause this condition and, in some instances, it results in disassociative states during which the individual behaves as though reexperiencing the traumatic event. Nothing in Dr. Marceau's examination of Felde would support a claim of post-traumatic stress disorder.
There was lay testimony that there was a noticeable difference in Felde's behavior before and after his military duty in Vietnam. Before his service, he was a jovial, happy-go-lucky *377 kid. Afterward, he was moody, depressed, and irritable, with erratic sleeping habits and a low tolerance for alcohol. One of Wayne Felde's sisters, Maria Kristine Krebsbach, testified that she had sent one brother to Vietnam and a different one, a stranger, had returned. This sister, a nurse, and her mother, also a nurse, attempted to get psychiatric help for Felde but were unable to do so.
The transcript of testimony of Dr. Guillermo Olivos was read into the record. A board certified psychiatrist, Dr. Olivos saw Wayne Felde on December 8, 1973, after the Maryland homicide. Concerning the killing of his friend, Felde had a poor memory and questioned whether he did it, how he did it, and whether he did it in self-defense. He was ambivalent and depressed about the situation.
Dr. John P. Wilson testified for the defense as an expert psychologist and professor of psychology who has made special studies of the post-traumatic stress disorder in Vietnam veterans. Dr. Wilson examined Felde on August 30, 1979, at the Caddo Parish Jail for four and a half hours. Dr. Wilson concluded unequivocally that Wayne Felde had a chronic form of post-traumatic stress disorder. This is a recognized behavioral disorder or mental defect which is recognized by the American Psychiatric Association. The symptoms are also shared by survivors of atomic attacks, holocausts or natural disasters. Post-traumatic stress response symptoms include: depression; flashbacks to the trauma; inability to control one's impulses; violent, explosive behavior; frequent suicidal thoughts and recurring nightmares. There is often memory impairment and inability to feel close to people, an emotional numbing. There is a great deal of survivor guilt with this disorder. Because of the type of combat required in Vietnam, veterans of that conflict also have moral guilt. The disorder is not new but was only recently recognized by the American Psychiatric Association as a bonafide mental disorder. Sixty percent of Vietnam combat veterans experience post-traumatic stress, a very high percentage. This is because units did not stay together, there was no real war objective, the soldiers were quite young, and drugs were freely available at a low price. Vietnam soldiers averaged 19.2 years, whereas those in World War II and Korea averaged 26½. The units in World War II stayed intact and came home together whereas in Vietnam each veteran came home alone. Vietnam veterans with P.T.S.D., or post-traumatic stress disorder, tend to move from one job to another. Felde's military record showed three AWOLs and a drunk charge, the first AWOL occurring one month after he returned from Vietnam. On one of these occasions, Felde wrecked a brand new car; his behavior was erratic and irrational. These episodes were consistent with his post-traumatic stress syndrome as were his marital difficulties. Part of the syndrome is a hyper alertness, where the person becomes easily irritated and agitated and startles easily. Sleep disturbances are part of the disorder. Twenty-five percent of all men in prison are Vietnam era veterans. The suicide rate of Vietnam veterans is thirty-three to forty percent higher than that of others the same age. The alcoholism rate among Vietnam veterans is sixty percent higher than it was for veterans of World War II or Korea. The Veterans' Administration now recognizes post-traumatic stress disorder as a service connected disability for which treatment can be received. Stress in a person's emotional life, such as the death of a mother, can trigger disassociative reactions. Dr. Wilson said that Felde's Maryland killing sounded like a classic disassociative reaction in which a person uses survival contact tactics because he is not fully aware of what is happening. Many Vietnam veterans suffering from post-traumatic stress disorder are being misdiagnosed as being alcoholics or having other disorders. Felde's prison record in Maryland was exemplary, which is characteristic of Vietnam veterans. The confined, controlled environment helps the post-traumatic stress disorder. Although they suffer tremendously, such inmates tend to behave well while incarcerated. Dr. Wilson testified that, since his father died when Wayne *378 Felde was twelve, he was particularly close to his mother, the most significant support person in his life. After losing his mother and then learning that the police were coming for him, he felt helpless, trapped and scared. He bought the gun as a form of security against an impending threat. Many Vietnam veterans even sleep with their weapons. In the doctor's opinion, Felde bought the gun as part of a decision to kill himself. When Felde pulled the gun in the car, it was Dr. Wilson's opinion that he wanted to kill himself rather than Officer Thompkins. Dr. Wilson recounted Felde's account of the situation beginning at the Dragon Lounge, "they asked me where, where I had the, where the gun was, then they handcuffed me and put me in the police car. I was in the back of the car and I thought I'd blow my brains out. I tried to turn the barrel around towards my face. I remember the jerk going forward then I saw flashes, flashes like incoming round hits, like firecrackers, hearing machine guns, I heard machine guns, I heard rifle fire, I heard more explosions and I couldn't move. I was happy because I knew I was going to die." (Tr. 1804-1805) According to Dr. Wilson, this fragmented memory is totally consistent with a disassociated state and flashback typical of post-traumatic stress disorder. In Dr. Wilson's opinion, "At that time, in that disassociated state, he couldn't discriminate right from wrong and he couldn't conform his conduct to the law. I think he was totally disoriented." (Tr. 1806) Dr. Wilson said that Felde needed long term group psychotherapy with other veterans and, if he were put on the street, he would either kill himself or kill someone else. Dr. Wilson also said that the M.M.P.I. tests (Minnesota Multiphasic Personality Inventory) on Felde were entirely consistent with P.T.S.D. His M.M.P.I. shows a depressed, scared, introverted, passive person. Dr. Wilson admitted that Felde's reloading of the gun was inconsistent with his desire to kill himself. He also admitted it was possible Felde shot Thompkins simply because he didn't want a return to prison.
Dr. Charles Figley, a tenured professor in psychology, author of articles and books, and a nationally recognized expert on the adjustment problems of Vietnam veterans, testified as an expert psychologist that Felde is definitely suffering from a mental defect, a post-traumatic stress disorder. Felde was in the upper twenty percent of veterans in his exposure to combat stress. In this doctor's opinion, Felde bought the gun to kill himself and was trying to commit suicide in the police car.
Dr. Joe Ben Hayes, an expert in psychiatry, testified that, in his opinion, Felde is suicidal and has a post-traumatic stress disorder. In this doctor's opinion Felde bought the gun to kill himself if he were cornered.
Dr. Norman Mauroner, a member of the Sanity Commission, and a specialist in psychiatry testified in rebuttal. In Mauroner's opinion, on October 20, 1978, at approximately 9:30 P.M., Felde was able to distinguish right from wrong. Dr. Joe Ben Hayes then testified again in surrebuttal that Felde did not give him any real information about his disorder until his fourth evaluation.
ASSIGNMENT OF ERROR NUMBER ONE
"The prosecution engaged in improper pretrial maneuvering and overreaching for the purpose of interfering with trial preparation of defense counsel and thereby caused the defendant to be deprived of his rights to compulsory process and effective assistance of counsel."
It is contended that the state fixed trial in State v. Mills, a second degree murder case with the same defense counsel, less than four weeks prior to Felde's trial to prevent Felde's counsel from proper preparation. Further, it is argued that the Mills' trial was continued until September 8,1980, less than a month after Felde's trial began, to hamper defense counsel's concentration. Despite these alleged manuevers, counsel argues that he could not request a continuance because of Felde's mental deterioration in prison.
*379 Defense counsel did not object to the setting of the Mills' case for trial and raises the issue for the first time on appeal. LSA-C.Cr.P. art. 841.[6] Despite the lack of a contemporaneous objection, the assignment has merit if it was a factor in the jury's decision. In a death penalty case, procedural rules that diminish the reliability of a jury's determination of guilt or sentence are invalid. Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). See State v. Sonnier, 379 So.2d 1336 (La., 1980).
Defense counsel was engaged to represent Felde on July 13, 1979, and trial began on August 11, 1980, giving him a year to prepare the case. It has not been established that the prosecution tried to hinder Felde's counsel. The latter conducted a vigorous defense. The record does not indicate any lack of preparation or establish that the defense was prejudiced. When there is inadequate time, the proper remedy is a continuance, which was not requested. LSA-C.Cr.P. art. 712.[7]
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER TWO
"The unreasonable and unjustifiable voir dire and trial schedule fixed by the trial court deprived the accused of his right to due process of law, his right to effective assistance of counsel during voir dire and at trial, his right to full voir dire examination of prospective jurors, his right to trial by a fair and impartial jury, and his right to testify at trial in his own behalf."
It is argued that the trial judge accelerated the trial schedule in order to complete the matter before the Labor Day weekend and thereby subjected defense counsel and defendant, as well as the jury, to undue fatigue. Also, the schedule created defense problems in examination of out of town experts. It is contended that the trial schedule was as follows:

August 11 (Monday)  9 a.m. to 10:15 p.m.
August 12 (Tuesday)  9 a.m. to 9:30 p.m.
August 13 (Wednesday)  9 a.m. to 9 p.m.
August 14 (Thursday)  9 a.m. to 8:30 p.m.
August 15 (Friday)  9 a.m. to 3:15 p.m.
August 16 (Saturday)  9 a.m. to 3 p.m.
August 17 (Sunday)  10 a.m. to 7 p.m.
August 18 (Monday)  9 a.m. to 7:30 p.m.
August 19 (Tuesday)  9:30 a.m. to 6 p.m.
August 20 (Wednesday)  9 a.m. to midnight
August 21 (Thursday)  12:01 a.m. to 1:15 a.m.

[First Supplemental Brief, P. 43]
It is conceded that these hours included one and one half hour lunch and dinner recesses.
There was no specific objection to the trial schedule. LSA-C.Cr.P. art. 841. The trial was conducted in an expeditious manner as required by LSA-C.Cr.P. art. 17,[8] and the sequestered jury undoubtedly preferred that the trial move forward on a seven day basis. There is no inherent prejudice in such a trial procedure. Oertle v. United States, 370 F.2d 719 (10 Cir.1966).
*380 Defense counsel, despite the strain on his time and energy, conducted an excellent defense. The extensive evidence, lay and expert, about Felde's post-traumatic stress disorder following combat in Vietnam is very persuasive. The jury was moved to state their support for veterans in general although they rejected Felde's plea of insanity at the time of his offense.[9] There is no indication that either the guilty verdict or the sentence was influenced by the trial schedule.
This assignment lacks merit.

ASSIGNMENTS OF ERROR NUMBER THREE, SIXTEEN, SEVENTEEN, EIGHTEEN, NINETEEN, TWENTY, TWENTY-ONE, TWENTY-TWO, TWENTY-THREE, TWENTY-FOUR, TWENTY-FIVE, TWENTY-SIX, AND TWENTY-SEVEN
"The misinformation and misrepresentations set forth in the prosecution Response to Defendant's Motion for Discovery and in the prosecution Supplementary Response to Defendant's Motion for Discovery." (No. 3)
"The prosecution failure to furnish the defense with any notice of intent to utilize extraneous offense evidence at trial." (No. 16)
"The improper and prejudicial prosecution utilization of extraneous offense evidence at trial." (No. 17)
"The prosecution failure to furnish the defense with any notice of intent to utilize at trial alleged inculpatory statements purportedly made by the accused." (No. 18)
"The improper and prejudicial prosecution utilization at trial of alleged inculpatory statements purportedly made by the accused which were not legally admissible as evidence." (No. 19)
"The prosecutor, in asserting facts by way of questions propounded to witnesses in the presence of the jury, made himself a witness without being subject to crossexamination, in violation of the fundamental principle of the hearsay rule and of the constitutional right to confrontation." (No. 20)
"The prosecutor, through improper displays and by making factual statements in the form of questions propounded to witnesses in the presence of the jury, improperly utilized an inculpatory statement allegedly obtained from the defendant by police in connection with the defendant's 1972 Maryland homicide charge, neither the existence nor the free and voluntary character of which statement was ever established by any evidence whatsoever, either before or after its misuse by the prosecutor, who was wellaware that the defendant's Maryland conviction had been reversed because of the use at trial of that same statement, the character of which the Maryland Court of Criminal Appeals held had not been shown to be free and voluntary." (No. 21)
"The denial by the trial court of the Defense Motion to Expunge Portion of Sanity Commission Report." (No. 22)
"The sanity commission appointed by the Court on motion of the prosecutor, in addition to the authorized disclosure of objective psychiatric findings, improperly disclosed to the prosecutor inculpatory statements allegedly made by the defendant, which information was improperly *381 utilized at trial through the use of assertive questions propounded to witnesses by the prosecutor in the presence of the jury." (No. 23)
"The prosecutor, in order to subvert the insanity defense, asserted in questions propounded in the presence of the trial jurors, facts which he was prohibited from proving, thereby improperly commenting, by way of question, on inadmissible evidence, to wit, inculpatory excerpts from statements made to the sanity commission in 1979, and to Maryland police in 1972." (No. 24)
"Prosecution display and utilization at trial of inculpatory statements allegedly made by the defendant to the sanity commission appointed by the court on motion of the prosecutor, which statements were neither freely or voluntarily made as they were legally compelled and also because, at the time they were allegedly obtained from the defendant, he was under such extreme conditions of custodial mistreatment and stress that any such statements were the direct result of, and totally attributable to, the exertion of improper influence, fear, intimidation, menace, coercion and duress upon the mind and person of the defendant." (No. 25)
"The prejudicial failure of the trial court to immediately order the trial jury removed from the courtroom when specifically requested to do so by defense counsel." (No. 26)
"A prosecution rebuttal expert witness, who was a member of the sanity commission appointed by the court on motion of the prosecution to examine the accused, intentionally answered a defense question on cross-examination in an unresponsive manner for the sole purpose of prejudicing the defendant through disclosure to the jury of legally inadmissible and erroneous information allegedly obtained from the defendant, by the prosecution expert witness during his court-ordered psychiatric examination of defendant, which information had been disclosed to, and discussed with, the prosecutor by the witness prior to his being called to testify for the prosecution on rebuttal." (No. 27)
The prosecution represented, in answers to discovery, that it had no statements by the defendant and that it did not intend to introduce in evidence any oral statements made by defendant. It did not do so. However, statements made by Felde to Dr. Marceau and to Maryland authorities were used in cross-examination.
Mrs. Maria Krebsbach, Felde's sister, was asked by the state to read from a document the following: "We were wrestling over my rifle and I told him to leave my home and he got shot. He would not leave so he got shot." (Tr. 1554) An objection to this line of questioning was sustained. Defense counsel did not ask that the jury be admonished to disregard the testimony and no admonishment was given. The state was told to lay a foundation for introduction of the Maryland confession, S-83, before using it for cross-examination. It was never introduced into evidence.[10]
Later, Ms. Krebsback was asked if Felde said, "You don't have to worry about him, I blew his head off, he's in my bedroom closet" (Tr. 1558). She responded that she did not recall those words. All she remembered was Felde saying, "I killed a man, I think." (Tr. 1558) There was no evidence that the prior statement had been made. Mrs. Krebsbach had testified on direct examination about her knowledge of the homicide, and the state was entitled to cross-examine her on the details of the event.[11]
Defendant contends that the information given to Dr. Marceau during his sanity examination was privileged and *382 should not have been used in his cross-examination. However, the doctor-patient privilege does not apply to a physician who is court appointed. LSA-R.S. 15:476. Further, the privilege was waived when defendant pleaded insanity. State v. Berry, 324 So.2d 822 (La., 1975); State v. Aucoin, 362 So.2d 503 (La., 1978).
Defendant also argues that the Fifth Amendment to the United States Constitution[12] prevented cross-examination on statements purportedly made by Felde to Dr. Marceau. When a defendant fails to plead not guilty by reason of insanity, the information furnished to the sanity commission cannot be used in his cross-examination. State v. Jones, 359 So.2d 95 (La., 1978). Involuntary, uncounselled disclosures at a pretrial sanity examination cannot be used at trial, without violation of the Fifth Amendment privilege against compelled self-incrimination. Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In Estelle v. Smith, supra, a psychiatrist who examined defendant under court order to determine his competency to stand trial testified at the penalty phase on the basis of that examination that Smith was a severe sociopath and Smith was sentenced to death. The court in Estelle distinguished that situation from one in which there was a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." Estelle v. Smith, supra, 451 U.S. at 468, 101 S.Ct. at 1876, 68 L.Ed.2d at 372. However, Felde placed his sanity at issue. Compare United States v. Madrid, 673 F.2d 1114 (1982). Felde's counsel had no objection to the sanity commission's appointment. [Caddo Proceedings, Tr. 8] Thus, his attorney participated in the "significant decision" to submit to the examination. Estelle v. Smith, supra, 451 U.S. at 471, 101 S.Ct. at 1877, 68 L.Ed.2d at 374. Wayne Felde said that, to him, the members of the sanity commission amounted to policemen; he did not trust them when he went in to talk to them. He was guarded and polite, but said he was not cooperative. Therefore, any statements made to Dr. Marceau were free and voluntary.
The statements were not introduced into evidence; they were used by the prosecution only in questioning Felde. Miranda[13] does not preclude cross-examination on the basis of voluntary, uncoerced, prior statements which are inconsistent. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
The question of whether Felde was in a disassociated state and unable to remember what happened at the time of the crime was a key issue at trial.
Felde was asked, "Do you recall telling Dr. Marceau that you vaguely remembered pointing the gun at the police officer and telling him to stop and let you out, and when your instructions were not followed, the officer started wrestling with you for the gun, the car hit a guard rail and the gun went off?" (Tr. 2150) Felde said he did not recall the statement and did not admit making other statements to Dr. Marceau. Dr. Marceau was not called in rebuttal. On direct examination, Dr. Marceau was not allowed to testify about the substance of what Felde told him. Since there was never any affirmative evidence that *383 the statements were actually made, any error was relatively harmless. LSA-C. Cr.P. art. 921.[14] Compare Esquivel v. State, 96 Nev. 777, 617 P.2d 587 (1980) where the conviction was reversed because defendant was impeached with statements made to a psychiatrist in a court ordered mental examination.
The prosecution claimed in rebuttal argument to the jury that what defendant told Dr. Marceau was the truth:
"And either the doctor made it up or someone made it up and it does not fit in any way as an incriminating piece of evidence in this case that he pulled the gun and told the policeman to pull over, back in January of 1979, when Dr. Marceau spoke with the Defendant. It doesn't fit in any way at that time as incriminating evidence. In fact, it would have been more incriminating for somebody to tell him he pulled the gun and started executing the policeman. But, see, the truth is, obviously, the Defendant told Dr. Marceau what he recalled at the time, four months after the incident." (Tr. 2344)
The prosecutor was to some extent replying to an argument made by defense counsel, as follows:
"He's got a lot of opportunity to lie in this case, a lot. He had a lot of opportunity to lie in Maryland, and I submit that he didn't.
"My recollection of what Dr. Marceau said was that he seemed to be perfectly truthful. He didn't know exactly how much he remembered and how much was told to him.
"And why would he say the car hit a guardrail and went off at that time? That is what the paper said and that is what he was told, no doubt, by the people who were guarding him, or from the police reports." (Tr. 2295)
What defendant told Dr. Marceau was not in evidence. Felde did not admit the statements. Therefore, these facts bearing on his credibility were not of record. State v. Sayles, 395 So.2d 695, (La., 1981). Although the prosecution's rebuttal argument was improper, defense counsel did not object. In view of the ample independent evidence that Felde was sane at the time of the offense, it is unlikely this argument carried great weight with the jury. See State v. Moore, 414 So.2d 340 (La., 1982); State v. Hayes, 364 So.2d 923 (La., 1978). Compare State v. Carthan, 377 So.2d 308 (La., 1979). It was only after learning that he was wanted by the police that Felde bought the pistol and shells. It was Thompkins, not Felde, who was shot and Felde reloaded his gun before he was apprehended. Even one of the expert witnesses supporting defendant's insanity defense admitted that it was possible he shot officer Thompkins to avoid going back to jail.
These assignments lack merit.
ASSIGNMENTS OF ERROR NUMBER FOUR AND FIVE
"The denial by the trial court of the Defense Motion for Court Order Commanding State Production and Disclosure of Statements and Addresses of Witnesses Favorable to the Defense; (No. 4) and
"The prosecutorial nondisclosure and suppression of exculpatory evidence of the intoxication of the accused at the time of the offense charged which exculpatory evidence was material to the question of guilt." (No. 5)
As to Assignment No. 4, the state denied having any addresses for the witnesses in question more current than those in possession of defense counsel. There is no indication that there were exculpatory statements by these witnesses. Their addresses and statements were subject to discovery only if they were favorable to the defendant and material and relevant to the *384 issue of guilt or punishment. LSA-C.Cr.P. arts. 718, 723.[15]
As to Assignment No. 5, these witnesses could allegedly have testified on the question of defendant's intoxication, but there was abundant other evidence that defendant was intoxicated at the time of the crime. The prosecution denied having any information that defendant was intoxicated to the point of not knowing what he was doing, but was willing to stipulate that defendant was intoxicated.
Although defense counsel argued that the prosecutor had the addresses he wanted and also exculpatory material regarding intoxication, he did not ask for an in camera examination by the trial court to settle the argument. Absent some showing that the state was suppressing exculpatory material, the trial court did not err in refusing to give defendant's counsel the prosecution's files on these witnesses.
These assignments lack merit.
ASSIGNMENTS OF ERROR NUMBER SIX, SEVEN, AND EIGHT
"The denial by the trial court of the Defense Motion for Court Order Commanding Prosecution Production of Photographs Favorable to the Defense." (No. 6)
"The granting by the trial court of the prosecution Motion to Quash Subpoena Duces Tecum." (No. 7)
"The prosecutorial nondisclosure and suppression of photographic evidence which was favorable to the accused and material to the issues of credibility and culpability." (No. 8)
Defense counsel admits that any error as to Assignment No. Seven was harmless.
Defendant contends in assignments six and eight that the state had photographs of Felde which were not given to the defense, specifically shots showing Felde on the ground after being shot. It was not conclusively established that any additional photographs existed, but defense counsel argued that he had seen one in the prosecutor's office which he did not receive.[16] The state offered to let the court conduct an inspection of all the photographic negatives in its records. (Tr. 246) Thus, the defense could have had an in camera examination of the negatives to determine *385 if there were any photographs which had been withheld but did not avail itself of the opportunity.
It is argued in connection with these assignments that the police intended to shoot Felde in cold blood. This argument is irrelevant to the real issue, the circumstances under which Felde shot officer Thompkins.
Further, the evidence does not support defendant's contention that the police attempted to execute Felde. Mr. Elzie A. Sandifer, who lives adjacent to the scene of Felde's shooting, was a defense witness who said he heard a voice say, "throw the gun down", before he heard two shots. (Tr. 1306) Mrs. Eloise Sandifer, heard a yell, "[T]hrow the gun down," before the first shot. (Tr. 1328) After the first shot, she heard "drop it". (Tr. 1330) According to her testimony, there was a warning before the first shot and an additional warning before the second shot. The uncontradicted evidence is that Felde's hands were handcuffed in front of him when he was shot. The pattern of his injuries does not prove that they must have been behind him. See Footnote 4, supra.
These assignments lack merit.
ASSIGNMENT OF ERROR NUMBER NINE
"The continuous utilization by the prosecutor of improper leading questions on direct examination of prosecution lay witnesses."
When defense counsel objected to leading questions, his objections were sustained. In other instances, when defense counsel failed to object, he cannot raise the issue on appeal. LSA-C.Cr.P. art. 841. Leading questions are not the type of prosecutorial error which diminish the reliability of a jury's verdict. Beck v. Alabama, supra, is inapplicable. Only when there is a clear abuse of discretion which prejudices defendant's rights will a conviction be reversed because of leading questions. State v. Swift, 363 So.2d 499 (La., 1978); State v. Vanderhoff, 415 So.2d 190 (La., 1982).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER TEN
"The improper cross-examination of the defendant by the prosecutor in the presence of the jury regarding the fact that the deceased father of the defendant had been convicted of a federal criminal offense."
It is contended that asking defendant's sister, Maria Krebsbach, if her father was on probation from a federal offense when he died, together with other questions about her father's drinking problem and violence, implied that Felde was, like his father, a bad man.
Defense counsel did not object to this line of questioning. Similar information was brought out by the defense during Felde's direct testimony.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER ELEVEN
"The improper admission into evidence by the trial court of State Exhibits 56 A and 56 b."
It is contended that the trial court should not have allowed a copy of the permanent driver's license of Felde's sister, Florence McDonald, and an enlargement of the photograph on that license into evidence. It is argued that the state's only purpose was to utilize Florence McDonald's personal unattractiveness against her defendant brother.
Mr. Mustin of Lorant's testified that Florence McDonald cashed a fifty dollar check when Felde bought his gun, using a driver's license number for identification. Mustin identified the license number as the one on the check and the photograph as a depiction of the woman who cashed it. Both were relevant to the circumstances in which defendant purchased the murder weapon. The evidence was properly admitted. See State v. Gordy, 380 So.2d 1347 (La., 1980); State v. Paster, 373 So.2d 170 (La., 1979).
This assignment lacks merit.

*386 ASSIGNMENT OF ERROR NUMBER TWELVE
"The improper exclusion from evidence by the trial court of Defense Exhibit 133."
It is argued that a 1975 letter written by Felde's brother-in-law, David Krebsbach, documented the changes produced in Felde from his combat in Vietnam. Thus, it corroborated the insanity defense, showed that Felde's mental condition was not a recent concoction by the defense, and should have been admitted.
The letter states: "He served in combat over in Vietnam. Upon his return from Vietnam, he was stationed nearby and resided with us. He was a changed person upon returning from Vietnam. He was very quiet and not as fun loving. Had nightmares, talking in his sleep, was nervous and twitchy, and started drinking. He was discharged honorably from the army."
The letter was properly excluded as hearsay offered to show the truth of its substance. LSA-R.S. 15:434. The information in the letter was brought out during Krebsbach's testimony. This was the better evidence. Since Krebsbach testified about the letter, his 1975 opinion was given to the jury. There was no error.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTEEN
"The improper exclusion from evidence by the trial court of Defense Exhibit 173."
The trial court refused to admit in evidence a questionaire distributed by a group called "Citizen Soldier", which was intended to identify Vietnam veterans who had suffered from exposure to "Agent Orange" (Dioxin). It is argued that inability to question Michael Uhl, the founder of Citizen Soldier, about results of the questionaire prejudiced the defense.
The questionaire revealed unauthenticated complaints by other veterans. There was ample testimony that defendant's combat experience and exposure to Agent Orange could have created a post-traumatic stress syndrome. The questionaire results were hearsay and essentially irrelevant to the question of whether defendant was insane at the time of the crime. The exhibit was properly excluded.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER FOURTEEN
"The trial court improperly restricted the scope of defense inquiry into the issue of insanity and improperly limited the evidence to be utilized by the defense in establishing the insanity of the accused at the time of the offense by the required preponderance of evidence."
Defendant contends that the trial court improperly prevented him from questioning Maria Krebsbach about the effects of World War II on her father. The desired testimony was irrelevant. LSA-R.S. 15:275.[17]
Defendant also alleges that defense witness Michael Uhl should have been qualified as an expert concerning the effect of Agent Orange on Vietnam veterans. Mr. Uhl had researched complaints from Vietnam veterans, but this did not qualify him as an expert on the effect of Agent Orange. Uhl was not allowed to testify about his own ability to cope with Vietnam combat because the subject was irrelevant.
Defense counsel argues that the trial court erred in sustaining an objection to testimony of Linda Vandevanter, an operating room nurse in Vietnam, regarding the type of combat wounds received by Vietnam veterans and her personal feelings about the war. Both were irrelevant. There was extensive expert testimony by *387 Dr. Wilson and Dr. Figley about the effects of the Vietnam war on many of its veterans.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER FIFTEEN
"The granting by the trial court of the Motion by State for Independent Mental Examination of Defendant."
The trial court ordered a mental examination of defendant by state experts in the middle of trial, but that order was vacated. It is argued that the prospect of the examination adversely affected defense counsel, his client, and the jury.
Since the examination never took place, the trial court's error in ordering it is moot. There is no evidence that the threat of the examination affected defense counsel or his client. There is no indication that the jury had knowledge of the proposed examination.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER TWENTY-EIGHT
"The repeated sua sponte interruptions, objections, remarks and comments, both express and implied, made by the trial court, in the presence of the jury, during the direct examination of defense witnesses, and the cross-examination of prosecution witnesses, by defense counsel, which were, no doubt, inferred by the trial jurors to be expressions of judicial opinion concerning relevant issues of facts, law and credibility bearing on the question of guilt, thereby affecting the jury in its role as ultimate trier of fact, and causing unfair prejudice to the accused."
This assignment contends that the trial court made prejudicial comments on the evidence.
Once the trial court ordered counsel to "... please, let's get back to the subject matter of this case", (Tr. 1079) a proper admonition.
Maria Krebsbach said "I guess I'm lost" during the course of her testimony: the trial court commented "[t]he observation is correct" (Tr. 1553). There was no objection to the remark, which did not prejudice the defense.
When the court recessed for lunch, Ms. Krebsbach was on the stand and asked if she could leave. The reply was: "[Y]es ma'm". She said "Oh well, I ..." and was told: "[D]on't sit there for an hour and a half." (Tr. 1564) There was no objection to this comment. It was impatient but harmless.
When the prosecutor attempted to question Ms. Krebsbach about the effect of World War II on her father, the trial court, after a long dialogue, commented "You know we could get to calling everybody in World War II, maybe we should ..." (Tr. 1571). The trial court was indicating that the line of questioning was irrelevant.
During the examination of Dr. John Wilson, the trial court commented that the witness was creating a problem with his commentary and editorializing on every question. On occasion the trial court also attempted to limit irrelevant and unnecessary examination of various witnesses. LSA-R.S. 15:275. However, the trial court's few remarks do not establish that any impression of the accused's guilt or innocence was conveyed to the jury. LSA-C.Cr.P. art. 772; State v. Williams, 375 So.2d 1379 (La., 1979).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER TWENTY-NINE
"The highly improper and inflammatory manner in which the prosecutor utilized and displayed photographic evidence during his impassioned argument to the jury, for the purpose of prejudicing the minds of the jurors against the defendant, deprived the defendant of a fair and impartial trial in that it caused the jury to return a verdict which was based on prosecutorial passion and prejudice rather than on the actual evidence properly introduced at trial."
*388 Defendant contends that the state deprived defendant of a fair trial by the manner in which certain photographic evidence was used in the prosecutor's closing argument. Displaying photographs, the state argued:
"Does this look like a foxhole or a cave, or does that look like the ride back at the penitentiary?
"Does this look like a war scene at night or does that look like a police car with sirens on top on a four lane highway in Shreveport, Louisiana? That's a ride back to the penitentiary.
"Does this look like anything you see in Vietnam. Or does that look like a ride back to the penitentiary.
* * * * * *
"You show me something that looks like Vietnam in this picture. You decide whether this looks like Vietnam or this looks like a ride back to the penitentiary and you decide if that man did not intend to kill." (Tr. pp. 2344-2346)
The use of the evidence and the prosecutor's remarks were within the scope of proper closing argument. Moreover, there was no objection and defense counsel did not ask for an admonition or mistrial. LSA-C.Cr.P. arts. 770, 775.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY
"The prosecutor improperly influenced the jury to unreasonably reject the insanity defense by overemphasizing, and making repeated prejudicial prosecutorial references to, the consequences of the return by the jury of a verdict of `Not Guilty by Reason of Insanity'."
It is contended that the prosecutor's argument aroused the passions, prejudice and fears of the jurors and convinced them that an insanity verdict would result in Felde escaping or being released to the detriment of the general public. The following argument was made:
"If you find him not guilty by reason of insanity, he is not going up to Michigan, or wherever his experts came from, and sit around with a bunch of Viet Nam veterans and talk about things. The Judge will tell you, he is going to a State Hospital until the doctors recommend he be released, and then a judge will decide when that will be six months or a year, five years, whenever a judge decides in the future, upon recommendation of doctors at a State hospital, he must be released, and the judge's decision is reviewable by the Supreme Court as to the merits of that decision. And if he lines up two or three, I mean, goes around, patting them on the back, I'm doing fine, acts real nice, just like he did in the pen, do it two, three, four years, take his medication, act great, recommend his release. And, you know, you can't keep him in jail because he is not going to be in jail. He's going to be in a hospital. He's escaped from the penitentiary. He wants to go to a hospital. He doesn't want to go to the pen for life or possibly face the death sentence. He wants to go to the hospital where he can get out. And, just like he testified, when they didn't give him parole, he got out. And what will he do when they don't turn him loose the first time he wants out?" (Tr. 2271-2272)
The jury was charged:
"If a verdict of not guilty by reason of insanity is returned in a case of this nature, the Court must commit the Defendant to a proper State mental institution or to a private mental institution approved by the Court for custody, care and treatment.
"The defendant shall not be released until and unless the court determines that he can be released without danger to himself or to others". (Tr. 2366)
The prosecutor told the jury that Felde, if found not guilty by reason of insanity, would easily escape. There was no objection. Compare State v. Sharp, 418 So.2d 1344 (La., 1982). Because of the evidence that defendant was an escapee and intended to avoid further jail time, there was a factual basis for the argument. *389 LSA-C.Cr.P. art. 774. Although such "`... predictions of the consequences of the jury's verdict'" are improper, it is unlikely, in the context of the entire argument and the court's instructions, that the error contributed to the verdict. State v. Hayes, supra, 364 So.2d at 926.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-ONE
"The prosecution argument to the trial jury contained comments by the prosecutor to matters not in evidence, thereby adding to the actual evidence in the record through the influence of the prosecutor's official position and causing the jury to arrive at a determination of guilt by giving greater weight to the assertions of the prosecutor than to the actual legal evidence introduced at trial."
In rebuttal, the prosecutor referred to things not in evidence when he referred to the automobile seat with the bullet holes from the police car. He implied that the seat was available, but the defense did not want the jury to see it.
"The bullet holes in the seat, and I believe that we stated in the presence of the Jury the seat was present in the courthouse if anyone wanted it...." (Tr. 2333)
It is argued that there was no evidence the seat was available. However, Lieutenant J.O. Blankenship testified that the car seat was present in the courthouse and several photographs of it were admitted in evidence. The brief reference to the car seat was harmless.
In his closing argument the prosecutor referred to information in Dr. Marceau's report which was not in evidence. In rebuttal the prosecution referred to statements made by Felde to Dr. Marceau and said that what Felde had said at that time was the truth.
The closing references to Dr. Marceau's report were as follows:
"He examined the Defendant on January 31st, 1979, approximately four months after the incident, and we submit approximately four months after the incident, because it is before the Defendant learned of the possibility of asserting a delayed stress defense. Dr. Marceau examined the Defendant, discussed the fact that the Defendant had been in Viet Nam, discussed the Defendant's drinking problems, the Defendant indicated extreme intoxication, and, thus, under some circumstances, not responsible for his actions, gave certain details of the offense that are not consistent with an alcohol blackout or consistent with a psychotic break or a break from reality, claimed he did not know for sure what he remembered as opposed to what he was told; but told him some things that only the persons in that car would be aware of, like, `Pull the car over, I have a gun.'..." (Tr. 2250)
In rebuttal, the prosecutor said:
"And either the doctor made it up or someone made it up and it does not fit in any way as an incriminating piece of evidence in this case that he pulled the gun and told the policeman to pull over, back in January of 1979, when Dr. Marceau spoke with the Defendant. It doesn't fit in any way at that time as incriminating evidence. In fact, it would have been more incriminating for somebody to tell him he pulled the gun and started executing the policeman. But, see, the truth is, obviously, the Defendant told Dr. Marceau what he recalled at the time, four months after the incident." (Tr. 2343-2344)
The prosecution erred in quoting from Dr. Marceau's report in his final arguments to the jury. This report was not in evidence. Compare McKenna v. State, 639 P.2d 557 (Nev., 1982) where the conviction was reversed because a court appointed psychiatrist testified about admissions made by the defendant during his psychiatric examination. There was no contemporaneous objection to the comments here and defendant did not request an admonition or move for a mistrial. The argument violated LSA-C. Cr.P. art. 774:

*390 "The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
"The argument shall not appeal to prejudice.
"The state's rebuttal shall be confined to answering the argument of the defendant."
The prosecution emphasized the fact that Felde apparently told Marceau that he had pulled a gun and told Thompkins to move over, but this does not necessarily negate the defense of insanity at the time of the crime. Felde testified that it was only after the first accidental shot was fired that he did not know what he was doing.
The error in quoting from Dr. Marceau's report was not so prejudicial that it requires a new trial. State v. Sharp, supra. The jury was charged that the prosecutor's arguments did not constitute evidence.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-TWO
"The sua sponte judicial decision to declare a lengthy court recess following the defense closing argument and prior to the rebuttal by the prosecutor resulted in severe prejudice to the defendant, particularly in light of the failure of the trial court to declare such a recess following the closing argument of the prosecution and before the closing argument of the defense."
The jury was offered a break at the conclusion of the state's closing argument, and defense counsel neither agreed nor objected. The court said: "I am talking to the jury. Are ready to go? No one needs a break, then? Okay." (Tr. 2279) Defense counsel also did not object at the time to the recess he now finds objectionable. Since there was no earlier recess, the twenty minute break for the jury after lengthy arguments was not an abuse of discretion. State v. Gordy, 380 So.2d 1347 (La., 1980); State v. Telford, 384 So.2d 347 (La., 1980); State v. Jones, 412 So.2d 1051 (La., 1982).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-THREE
"The rebuttal argument of the prosecutor to the trial jurors exceeded the scope of the defense closing argument."
Defendant complains again about the mention in rebuttal of information in Dr. Marceau's sanity commission report, cited as an example of calculated prosecutorial overreaching. Since defense counsel alluded to material in Dr. Marceau's report in closing argument, the rebuttal did not exceed the scope of the defense's closing argument. There was no contemporaneous objection, and it is unlikely that the argument had an undue influence on the jury.
Defendant also objects to the overruling of his objection to the prosecution reviewing the law on manslaughter, contending this was not proper rebuttal. Defense counsel had referred to the manslaughter statute in his closing argument so the rebuttal argument was proper.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-FOUR
"The judicial refusal to permit, and the unconstitutional failure of Louisiana codal provisions to provide for, defense rebuttal argument to the trial jury on the affirmative defense of insanity."
The state has the right to make the last argument to the jury. LSA-C.Cr.P. art. 765; State v. Wiggins, 337 So.2d 1172 (La., 1976).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-FIVE
"The Louisiana statutory presumption of sanity and the Louisiana codal provisions placing upon the defense the burden of establishing insanity at the time of the offense, are unconstitutional."
*391 Defendant's burden of proof on the affirmative defense of insanity is constitutional. State v. Lee, 395 So.2d 700 (La., 1981); Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-SIX
"The jury sequestration procedures employed by the trial court failed to properly insulate the jurors from extraneous influences, or the possibility thereof, and throughout the trial there occurred a continuing and substantial failure by the trial court to adhere to the sequestration mandated in a capital case, as repeated contacts, communications and conversations which took place between the jurors and non-juror third parties may well have resulted in the jury verdicts being based upon, and affected by, influences extraneous of the legal evidence introduced at trial."
Defendant contends that the jury was not properly insulated from outside influences because the jury room was the most convenient and, at times, the only place where hot coffee could be found. These allegations are unfounded and there is no real basis for the argument.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER THIRTY-SEVEN
"The prejudicial professional relationship between a trial juror and a prosecution witness whose identity as a member of the sanity commission appointed by the court on motion of the prosecution did not become known by defense counsel until subsequent to the return of the jury verdict."
There was apparently a relationship between juror Martha Dominguez, a psychiatric social worker, and a state witness. The record does not reveal with which witness Martha Dominguez was acquainted. It is contended that defense counsel thought defense rebuttal witness, Dr. Joe Ben Hayes, was the witness whom Martha Dominguez knew because the matter was brought up immediately after Dr. Hayes' rebuttal evidence in the following manner:
"BY THE COURT: Okay. I had one question here by Mrs. Dominguez. She was inquiring about any relationship that a Juror may have to a witness; and I will explain to her and to the Jury on that, if that is agreeable with you. It is almost impossible to pick a Jury that one or the other of the twelve may not have some relationship with some person to appear as a witness. My only inquiry to you, Mrs. Dominguez, is would this relationship at all affect you in rendering a fair and impartial verdict in the case? That is, can you....
"BY MRS. DOMINGUEZ:
(Juror) A. Not under the circumstances given....
"BY THE COURT: That is what I want to know....
"BY MRS. DOMINGUEZ:
(Juror) A. Not under the circumstances....
"BY THE COURT: Whatever relationship you may have to any of the witnesses, you must put it aside and disregard it and weigh the testimony of all witnesses alike, under all of the circumstances, and I will give you some brief explanation of how to evaluate testimony of witnesses, so you will not let that enter....
"BY MRS. DOMINGUEZ:
A. Not under the circumstances.
"BY THE COURT: Into your deliberation any more so than the consideration given to other witnesses....
"BY MRS. DOMINGUEZ:
(Juror) A. No, sir.
"BY THE COURT: Would not influence you because of your, perhaps, professional or personal relationship with the witness in your deliberation and rendition of verdict?
"BY MRS. DOMINGUEZ:
A. Correct, sir.

*392 "BY THE COURT: All right. Fine. That's, I didn't think it would but it had to be said. All right...." (Tr. 2241-2243)
Defendant alleges in brief that, after the jury commenced deliberations, the judge told him the acquaintance was with Dr. Mauroner, the state witness who testified in rebuttal as a member of the sanity commission and a specialist in psychiatry that Felde was able to distinguish right from wrong.
Disclosure during trial that a juror is acquainted with a witness does not necessarily prevent a fair trial. State v. Langendorfer, 389 So.2d 1271 (La., 1980); State v. Daniel, 378 So.2d 1361 (La., 1979). Defense counsel did not attempt at the time to determine the identity of the witness with whom the juror was acquainted and did not move for a mistrial or object in any manner. LSA-C.Cr.P. art. 841. The juror's responses indicate that her acquaintance did not affect her verdict.
This assignment lacks merit.
ASSIGNMENTS OF ERROR NUMBER THIRTY-EIGHT, THIRTY-NINE, FORTY, FORTY-ONE, FORTY-TWO, AND FORTY-THREE
"A preponderance of the evidence properly introduced at trial clearly established that the defendant was legally insane at the time of the offense charged." (No. 38)
"The trial jury unreasonably rejected the affirmative defense of insanity as the record of evidence did not reasonably support the finding by the jury that the defendant was both sane and guilty beyond a reasonable doubt." (No. 39)
"The circumstantial evidence relied upon in this case by the prosecution to prove the essential element of `specific intent to kill or inflict great bodily harm' was not legally sufficient for any rational trier of fact to conclude tha the requisite specific intent had been proved beyond a reasonable doubt." (No. 40)
"The evidence properly introduced at trial was insufficient for any rational trial jury to reasonably conclude that the prosecution had proved beyond a reasonable doubt that the requisite presence of the essential element of specific criminal intent was not precluded by the intoxicated or mental condition of the defendant at the time of the offense charged." (No. 41)
"The legal and competent evidence adduced at trial was not sufficient for any rational trial jury to find that every essential element of the offense of First Degree Murder had been proven beyond all reasonable doubt." (No. 42)
"The conviction in this case constitutes a deprivation of life, liberty and property without due process of law as it is based upon alleged conduct of the defendant which is totally attributable to combat infantry training, actual wartime combat experiences, and prolonged dioxin exposure, to which the defendant was subjectedbut for which he was not subsequently treatedby the United States Government." (No. 43)
It is contended that the jury erred in finding Felde guilty of first degree murder and rejecting his defense of insanity at the time of the crime on the basis of the evidence presented.
Defendant is correct in his contention that the expert testimony about Felde's post-traumatic stress syndrome by Dr. Wilson, Dr. Figley and Dr. Hayes, as well as the lay testimony about the affect of the Vietnam combat on Felde, is very persuasive. However, Dr. Marceau, Dr. Braswell and Dr. Mauroner, the three members of the sanity commission, all testified that defendant was sane at the time of the offense. Both Dr. Marceau and Dr. Mauroner are psychiatrists and a rational jury could have adopted their testimony over that of the defense witnesses.
It is also argued that there was no evidence of specific intent to kill or inflict great bodily harm and that, in his intoxicated state and mental condition, defendant was unable to have such an intent.
*393 There was evidence that indicated Felde deliberately killed officer Thompkins in order to escape. Felde's intoxication was apparently not total because he was able to get out of the police car, cross the median, negotiate the automobile lot, travel some additional distance and reload his gun while handcuffed.
Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that defendant failed to prove insanity by a preponderance of the evidence and that he had the specific intent to inflict great bodily harm or kill officer Thompkins. State v. Claibon, 395 So.2d 770 (La., 1981); State v. Lee, 395 So.2d 700 (La., 1981).
These assignments lack merit.
ASSIGNMENT OF ERROR NUMBER FORTY-FOUR
"The defendant was denied effective assistance of counsel at trial due to adherence by defense counsel to an employment condition set by the defendant that defense counsel not attempt to obtain any jury verdicts other than `Not Guilty by Reason of Insanity' or `Guilty of First Degree Murder' with Capital Punishment."
It is contended that defense counsel's agreement with Felde that he would not attempt to obtain any verdict other than not guilty by reason of insanity or guilty of first degree murder with capital punishment denied Felde his constitutional right to effective assistance of counsel. LSA-Const. Art. 1, § 13; U.S. Constitution, Amend. 5. Felde required this of his counsel as a condition of employment.
To establish ineffective representation, it must be shown that counsel did not meet the level of competency normally demanded in criminal cases. An adequate defense must be based on informed professional deliberation. McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Marzullo v. State of Maryland, 561 F.2d 540 (4th Cir.1977), cert. denied 433 U.S. 1011 (1978); "Effective Assistance of Counsel in Criminal Cases", 4:2 George Mason University Law Review at 241. Here, counsel, by agreement with his client, made an informed and deliberate decision not to ask for life imprisonment.
In his closing argument defense counsel said, "first degree murder, the best thing you can do for him, if you don't go with insanity, is first degree murder with the death penalty." (Tr. 2325) This could have been a calculated ploy, an all or nothing gamble. Compare Wiley v. Sowders, 647 F.2d 642 (6 Cir.1981). "Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. Estelle v. Williams, 425 U.S. 501 at 512, 96 S.Ct. 1691 at 1697, 48 L.Ed.2d 126 at 135 (1976). The fact that a particular strategy is unsuccessful does not establish ineffective assistance. Gray v. Lucas, 677 F.2d 1086 (5 Cir.1982).
After the jury determined that Felde was guilty of first degree murder, the sentencing hearing was held immediately by agreement of counsel without objection by any of the jurors. The state presented no further evidence. The jury, during the guilt phase of trial, had heard extensive evidence about mitigating circumstances and had been exposed to a tremendous amount of sympathetic testimony about Felde. Compare Washington v. Strickland, 673 F.2d 879 (5 Cir.1982). The factual synopsis does not fully reflect the defense effort. Defense counsel argued at the sentencing hearing as follows:
"I think we all.... No, I can't say that. I feel that he has gone through hell for a long time and I can't see him going down to Angola in his condition and being subjected to what he would be subjected to there. So I am not going to ask you to do what I think would probably be the merciful thing to do. I am not going to ask you to do that myself. He is going to have to do that because I don't think I can, but I believe when you all were elected as Jurors you'd said you could apply the death penalty and I think it *394 would be pretty.... I think if you return the verdict that was returned you probably have to impose the death penalty, I would think." (Tr. 2383)
Wayne Robert Felde testified and advised the jury to return the death penalty and stated in response to counsel's question that he would be unable to control his future actions if the death penalty was not returned:
"BY MR. FELDE:
A. All I can say to you all is.... I would advise you to return the death penalty in this case.... Keith Oliver, I know your cousin Joe Oliver. We were cell partners for about eight (8) months.... Mr. Coker, I know one of your good friends, too, Tommy Strange. We picked this Jury and we picked them on intelligence. I consider all of you people intelligent so I hope you will take my advice, return the death penalty. Thank you.
"BY MR. THOMAS:
Q. What if .... the death penalty is not returned, Wayne, do you think you will be able to control your actions in the future? Can you guarantee them that you could control your actions if you would(Interrupted)
A. I think other deaths will result. Yes, Mr. Thomas, I do. And that's why I suggested it, to prevent it from happening. They would be on your conscience if you can't return it. Now, I'm not trying to put you all in a bad position but you all are taking other people's lives in your hands, along with mine, so I think you should return it. I don't think no more needs to be said, Mr. Thomas. They're upset. Thank you." (Tr. 2385-2386)
Defense counsel later made a closing argument in which he said in part:
"... And at this point, I believe there is only one kind of help you can give him because I am not going to stand up here and tell you that you are doing him a favor by giving him life, because Angola is hell and for a crippled man it's hell twice over, and I think that's where he is going to go, first degree murder of a Shreveport policeman. (Tr. 2390)
* * * * * *
"... I'm waiting for something to come in here and tell me, you know, there's some reason I should ask you to spare this man but there's not. There, honestly, is not. There's not one reason that I can think of for him to continue to experience what he has been experiencing. I cannot think of one reason..." (Tr. 2391-2392)
Felde then made a closing argument as co-counsel:
"I'm not coming out and threatening anybody because that's not what it is. A walking time bomb, that's what it is. Somebody else will die as a result of it if I'm not put to death, I am sure. It's happened twice in eight years. There's been ten years of proof shown to you. I don't known where it went so, please, return that. I think, as countrymen, you owe me that much. I did my part. Please do yours. Okay?" (Tr. 2393)
There was no evidence other than Felde's testimony at the sentencing hearing.
In State v. Clark, 387 So.2d 1124 (La., 1980) defendant Clark told the jury he wanted to be sentenced to death but his counsel argued mitigating circumstances to the jury. Here, even after the guilty verdict, both Felde and his counsel pressed for the death penalty at the penalty phase of trial. After the jury rejected the claim of not guilty by reason of insanity, there is a grave question whether counsel could honor the agreement with his client and maintain a plea for the death penalty.
In Bishop v. State, 95 Nev. 511, 597 P.2d 273 (1979) defendant was allowed to represent himself, but the court appointed standby counsel. At the sentencing hearing, the state presented evidence of five aggravating circumstances: defendant refused to present any evidence of mitigating circumstances. Standby counsel informed the court that there were mitigating circumstances Bishop refused to allow them to present. Subsequently, on appeal, it was claimed that the court panel erred in not *395 hearing evidence of mitigating circumstances. The court stated:
"In the case at hand, Bishop had ample opportunity to present evidence of mitigating circumstances; however, he made it clear that he did not want to present or have standby counsel present such evidence. He had a Sixth Amendment right not to have counsel forced upon him. Faretta [v. California], [422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562] supra. When a defendant knowingly and voluntarily waives his right to counsel, as here, his refusal to present a defense does not negate his pro per election. People v. Teron, supra [23 Cal.3d 131, 151 Cal.Rptr. 653, 588 P.2d 773 (Cal., 1979)]. `Under Faretta, the state may not constitutionally prevent a defendant charged with a commission of a criminal offense from controlling his own fate by forcing on him counsel who may present a case which is not consistent with the actual wishes of the defendant.' Curry v. Superior Court, 75 Cal.App.3d 221, 141 Cal. Rptr. 884, 887 (1977). For this reason, the sentencing tribunal did not err when it did not delve into the mitigating evidence referred to by the standby counsels." 597 P.2d 276.
In the Bishop case an application for stay of execution was denied by the United States Supreme Court. Lenhard v. Wolff, 444 U.S. 807, 100 S.Ct. 29, 62 L.Ed.2d 20 (1979). The dissent claimed that the death penalty was being triggered by the arbitrary factor of the defendant's decision to acquiesce in his own death. However, that was not the view of the majority of the court. See Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976).[18]Bishop controls this issue. Felde, mentally competent to stand trial and enrolled as cocounsel, had a constitutional right to impose a condition of employment on his counsel. Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Thus, a defendant can limit his defense consistent with his wishes at the penalty phase of trial. Bishop, supra. A defendant can also waive post-conviction habeas corpus remedies. Gilmore, supra. A defendant cannot waive his right to appeal a death sentence. LSA-C.Cr.P. art. 905.9; People v. Stanworth, 71 Cal.2d 820, 80 Cal.Rptr. 49, 457 P.2d 889 (1969); Goode v. State, 365 So.2d 381 (Fla., 1978). Felde has had an excellent presentation of his appeal. Counsel's agreement not to ask the jury for life imprisonment does not invalidate his conviction or sentence.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER FORTY-FIVE
"The defendant was denied his right to effective assistance of counsel by the failure of defense counsel to voice timely contemporaneous objections, to request appropriate jury admonitions, and to move for mistrials, in numerous trial situations where the circumstances presented clearly required that such action be undertaken in order to protect and preserve the rights of defendant."
Defense counsel claims that he denied Wayne Felde effective assistance of counsel. On the contrary, the record reveals that he made an unusually vigorous and spirited defense. The representation here was within the upper range of competence.
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER FORTY-SIX
"Newly discovered evidence of Post-Traumatic Stress Disorder, which was not discoverable before or during the trial *396 despite the exercise of reasonable diligence, would probably have changed the jury verdict of `guilty' to a verdict of `not guilty by reason of insanity', had that evidence been available for introduction at trial."
Defendant contends that, after the verdicts were rendered, counsel first received addresses for three of the eight members of Wayne Felde's unit in Vietnam. It is argued that a new trial should have been granted, because this testimony, not previously available, would have substantiated the defense of post-traumatic stress disorder.
The expert and lay testimony on this point was quite comprehensive and the desired testimony would merely have been cumulative. LSA-C.Cr.P. art. 854[19] provides that the newly discovered whereabouts or residence of a witness does not constitute newly discovered evidence. Further there was no statement of the facts which would be established by this new evidence. The new trial was properly denied.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER FORTY-SEVEN
"The unreasonable and arbitrary ex parte action of the trial court in summarily quashing defense process which had properly issued for the hearing on the Defense Motion for New Trial."
Defense counsel subpoenaed the prosecutor for the hearing on the motion for new trial but the trial court excused the prosecutor from the subpoena.
Since the subpoena was served late and the prosecutor was unable to appear, the trial court was within its discretion in quashing the subpoena on the ground that it was oppressive.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NUMBER FORTY-EIGHT
"The denial by the trial court of the Defense Motion for New Trial."
Defendant contends that a new trial should have been granted because DSM-III, the Diagnostic and Statistic Manuel III of the American Psychiatric Association first recognized post-traumatic stress disorder in 1980, only months prior to trial. However, there was trial testimony that the American Psychiatric Association recognizes this disorder. Although the DSM-III has been adopted in Louisiana hospitals since the trial, this factor is not so material that it would be likely to produce a different result. State v. Talbot, 408 So.2d 861 (La., 1981).
This assignment lacks merit.
ASSIGNMENT OF ERROR NUMBER FORTY-NINE
"The failure of the trial court to grant the Defense Motion for Payment of Trial Expenses."
This assignment of error is irrelevant to defendant's appeal.
ASSIGNMENT OF ERROR NUMBER FIFTY
"The Uniform Capital Sentence Report of the trial judge."
*397 Defense counsel contends that the uniform capital sentencing report submitted by the trial judge reflects a negative attitude toward the defendant because it contains erroneous information and that this attitude toward the defendant was conveyed to the jury during trial.
The report is inaccurate in two particulars. It states that defendant completed the eleventh grade, whereas he graduated from high school. It states that Felde was sentenced to fifteen years for second degree murder and five years concurrently for four counts of assault, but the second degree murder conviction was reversed. Defendant received a total of twelve years when he pled guilty to manslaughter and four counts of assault. This erroneous information could not have had any bearing on the jury's decision because the correct information was introduced in testimony at trial. The trial transcript does not establish a negative attitude by the trial court; the errors in the sentencing report were apparently inadvertent.
Defendant also contends that he did not receive a copy of the capital sentence report as required by LSA-C.Cr.P. art. 905.9.1, § 3.[20] However, this technical omission did not harm the defendant.
This assignment lacks merit.

DEATH SENTENCE REVIEW
Under LSA-C.Cr.P. art. 905.9.1, every sentence of death is reviewed for excessiveness on the basis of three factors:
(a) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors;
(b) Whether the evidence supports the jury's finding of a statutory aggravating circumstance; and
(c) Whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
A. There is no indication that the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors.
B. The fact, as the jury found pursuant to LSA-C.Cr.P. art. 905.4(b), that the victim was a peace officer performing his regular duties is an adequate aggravating circumstance. "There is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property." Roberts v. Louisiana, 431 U.S. 633 at 636, 97 S.Ct. 1993 at 1995, 52 L.Ed.2d 637 at 641 (1977).
The evidence supports the jury's finding of this statutory aggravating circumstance.
C. The sentence review memorandum filed by the state reflects that no death penalty has been imposed in Rapides Parish since January 1, 1976, and there have been no verdicts of first degree murder. The homicides involving a charge of first degree murder have been plea bargained *398 to a charge of second degree murder or a lesser offense. None of the other murder cases involve the situation where a police officer has been killed. Thus, there are no similar cases, and this sentence cannot be held disproportionate to sentences in other cases.
For the foregoing reasons, the conviction and sentence of defendant, Wayne Robert Felde, are affirmed.
AFFIRMED.
DENNIS, J., concurs with reasons.
DENNIS, Justice, concurring.
I respectfully concur.
Normally, a defendant in a capital sentence hearing is entitled to a reasonably effective defense counsel acting as a diligent, conscientious advocate for his life. State v. Myles, 389 So.2d 12 (La. 1980). The constitutional right may be waived, however, and there is clear and convincing evidence in this record, as the majority opinion says, that the defendant knowingly and voluntarily waived the right to have his counsel plead for his life. Accordingly, I concur, being of the opinion that, except in the case of a valid proven waiver, as in the present case, the failure of a defense attorney to act as a conscientious advocate for his client's life in a capital case will constitute a denial of effective representation.

ON REHEARING
PER CURIAM.
The state submits that the sentence memorandum compiled in compliance with LSA-C.Cr.P. art. 905.9.1. omitted the death sentence imposed on Avery C. "Pete" Moore. Moore was convicted of first degree murder in Rapides Parish on March 11, 1982. The jury recommended that a death sentence be imposed and Moore was sentenced accordingly on May 5, 1982. His appeal is pending: State v. Moore, Docket No. 82-KA-1709.
Moore is a sixty-four year old white male with a low I.Q. who was convicted of joining with two other men in abducting, robbing, and killing a store clerk. The jury found that the aggravating circumstances were: aggravated kidnapping; armed robbery; and an especially cruel crime. Moore had a previous conviction for the manslaughter of his wife on October 6, 1967, and had been released from prison within two years of the present offense.
There is a significant similarity between Moore's record and Felde's: both had prior convictions for manslaughter. The sentence of Robert Wayne Felde is not disproportionate to that of Avery C. "Pete" Moore.
Rehearing denied.
NOTES
[1] LSA-R.S. 14:30 provided at the time of the crime, October 20, 1978:

"First degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. "Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury."
[2] LSA-C.Cr.P. art. 905.4(b) provides:

"The following shall be considered aggravating circumstances:
* * * * * *
"(b) The victim was a fireman or peace officer engaged in his lawful duties; ..."
[3] This account was contradicted by a witness, Keenan Gingles, who indicated that at least one other officer also fired a shotgun.
[4] The defense argues that Felde's hands remained handcuffed behind him throughout the encounter and this is proven by the pattern of his injuries sketched at Confederate Memorial Medical Center. The diagrams are not conclusive. If Felde's hand and arms were held in front of his head, also uninjured, they would not have been hit.
[5] LSA-C.Cr.P. art. 650 provides:

"When a defendant enters a combined plea of `not guilty and not guilty by reason of insanity,' the court may appoint a sanity commission as provided in Article 644 to make an examination as to the defendant's mental condition at the time of the offense. The court may also order the commission to make an examination as to the defendant's present mental capacity to proceed. Mental examinations and reports under this article shall be conducted and filed in conformity with Articles 644 and 646."
[6] LSA-C.Cr.P. art. 841 provides:

"An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
"The requirement of an objection shall not apply to the court's ruling on any written motion."
References to Art. 841 and failure to object will be found in subsequent assignments, not to indicate that the error cannot be considered but merely to note that the error was not a matter of concern at the time.
[7] LSA-C.Cr.P. art. 712 provides:

"A motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor."
[8] LSA-C.Cr.P. art. 17 provides:

"A court possesses inherently all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue such writs and orders as may be necessary or proper in aid of its jurisdiction. It has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done. A court has the power to punish for contempt."
[9] "STATEMENT ON BEHALF OF JURY

"BY MR. OLIVER: We, the Jury, recognize the contribution of our Viet Nam veterans and those who lost their lives in Viet Nam.
"We feel that the trial of Wayne Felde has brought to the forefront those extreme stress disorders prevalent among thousands of our veterans.
"We have attempted, through great emotional and mental strain, to serve and preserve the judicial branch of our government by serving on this Jury.
"This trial will forever remain indelibly imprinted upon our minds, hearts, and consciences.
"Through long and careful deliberation, through exposure to all evidence, we felt that Mr. Felde was aware of right and wrong when Mr. Thompkins' life was taken. However, we pledge ourselves to contribute whatever we can to best meet the needs of our veterans." (Tr. 2408)
[10] Felde's initial conviction in Maryland was reversed because this confession was not shown to be free and voluntary under a correct standard of proof. Felde v. Maryland, 336 A.2d 823, 26 Md.App. 15 (1975).
[11] In direct examination, she said:

"Yes, very. Very upset. He told mother to wipe his tears and he says, `I think there's a man in there that was shot in the head. I think I killed him.' And then, they, they took Wayne off." (Tr. 1513)
[12] Constitution of the United States, Amendment 5 provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."
[13] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[14] LSA-C.Cr.P. art. 921 provides:

"A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."
[15] LSA-C.Cr.P. art. 718 provides:

"Subject to the limitation of Article 723, on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
"(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
"(2) are intended for use by the state as evidence at the trial, or
"(3) were obtained from or belong to the defendant.
"The court may determine whether evidence is subject to the provisions of Paragraph (1) hereof by in camera inspection."
LSA-C.Cr.P. art. 723 provides:
"Except as provided in Articles 716, 718, 721, and 722, this Chapter does not authorize the discovery or inspection of reports, memoranda or other internal state documents made by the district attorney or by agents of the state in connection with the investigation or prosecution of the case; or of statements made by witnesses or prospective witnesses, other than the defendant, to the district attorney, or to agents of the state."
[16] "Many months, perhaps over a year, prior to the August 11, 1980, commencement of the Felde trial in Alexandria, defense counsel, perhaps even before he became defense counsel for Wayne Felde, was in the office of prosecutor Nesbitt on some other business. Prosecutor Nesbitt was on the telephone having an extended telephone conversation with someone and gave defense counsel permission to look through the police photographs in the Felde case which were on prosecutor Nesbitt's desk. Among the photographs were some of Wayne Felde lying on the ground shortly after being shot, at least one of which photographs was a full body shot, showing the entire person of Wayne Felde. Wayne Felde's arms were not over his head in the full body photograph although defense counsel cannot recall whether they were under him or handcuffed behind his back. But it was a full body photograph showing the entire body of Wayne Felde as he lay on his stomach after being shot." (First Supplemental Brief on Behalf of Defendant, Page 68)
[17] LSA-R.S. 15:275 provides:

"In the discipline of his court, the trial judge is vested with a sound discretion to stop the prolonged, unnecessary and irrelevant examination of a witness, whether such examination be direct or cross, and even though no objection be urged by counsel."
[18] "After carefully examining the materials submitted by the State of Utah, the Court is convinced that Gary Mark Gilmore made a knowing and intelligent waiver of any and all federal rights he might have asserted after the Utah trial court's sentence was imposed, and, specifically, that the State's determinations of his competence knowingly and intelligently to waive any and all such rights were firmly grounded.

"Accordingly, the stay of execution granted on December 3, 1976, is hereby terminated." Gilmore, supra, 429 U.S. at 1013, 97 S.Ct. at 437, 50 L.Ed.2d at 633.
[19] LSA-C.Cr.P. art. 854 provides:

"A motion for new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
"(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
"(2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
"(3) The facts which the witnesses or evidence will establish; and
"(4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
"The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence."
[20] LSA-C.Cr.P. art. 905.9.1, § 3 provides:

"(a) Whenever the death penalty is imposed, the trial judge shall expeditiously complete and file in the record a Uniform Capital Sentence Report (See Appendix `B'). The trial court may call upon the district attorney, defense counsel and the department of probation and parole of the Department of Corrections to provide any information needed to complete the report.
"(b) The trial judge shall cause a sentence investigation to be conducted and the report to be attached to the uniform capital sentence report. The investigation shall inquire into the defendant's prior delinquent and criminal activity, family situation and background, education, economic and employment status, and any other relevant matters concerning the defendant. This report shall be sealed, except as provided below.
"(c) Defense counsel and the district attorney shall be furnished a copy of the completed Capital Sentence Report and of the sentence investigation report, and shall be afforded seven days to file a written opposition to their factual contents. If the opposition shows sufficient grounds, the court shall conduct a contradictory hearing to resolve any substantial factual issues raised by the reports. In all case, the opposition, if any, shall be attached to the reports.
"(d) The preparation and lodging of the record for appeal shall not be delayed pending completion of the Uniform Capital Sentence Report."