720 So.2d 148 (1998)
STATE of Louisiana
v.
Karon METOYER.
No. 97-KA-2266.
Court of Appeal of Louisiana, Fourth Circuit.
October 7, 1998.
*149 Harry F. Connick, District Attorney of Orleans Parish, Charles E. F. Heuer, Assistant District Attorney of Orleans, New Orleans, for The State of Louisiana.
Robert Glass, Glass & Reed, New Orleans, for The Defendant-Appellant.
Before BARRY, PLOTKIN and LANDRIEU, JJ.
PLOTKIN, Judge.
The issue presented by this appeal is whether or not the defendant is entitled to a new trial because of the discovery of new evidence. We hold that defendant has met the standard of La. C. Cr. P. art. 851 and is entitled to a new trial.

PROCEDURAL HISTORY:
On September 12, 1996, the defendant, Karon Metoyer, was charged by bill of information with attempted second degree murder in violation of La. R.S. 14:27 and 14:30.1. At his arraignment on September 18, 1996, the defendant entered a plea of not guilty. He elected a bench trial on December 19, 1996, and, on February 18, 1997, the defendant was found guilty of attempted manslaughter. The defendant subsequently filed a motion for a new trial. The trial court conducted hearings on the motion on May 30, 1997, June 27, 1997, August 15, 1997, and August 22, 1997. The trial court denied the defendant's motion for new trial on August 22, 1997. Defendant filed a supplemental motion for new trial on September 2, 1997. The trial court denied the supplemental motion on September 8, 1997. The defendant waived delays, and the trial court sentenced him to serve twelve years at hard labor with credit for time served. It is from this conviction that defendant now appeals.

STATEMENT OF THE FACTS:
In June of 1996, Janine Metoyer Wilson was living in her father's home with her four children, her ex-husband, Jourdan Wilson, and her brother, Karon Metoyer. She and her ex-husband were attempting to reconcile. Brandy, Janine's oldest daughter, had previously complained to Janine that Karon's girlfriend had taken some of her clothes. Janine went to speak with Karon who was watching television in his room. Janine asked Karon to tell his girlfriend to stop wearing Brandy's clothes. At first, Karon ignored her. He then became upset and an argument ensued. Janine left Karon's bedroom and went into the kitchen. A few moments later, Karon walked into the kitchen, and they resumed arguing. Brandy came into the kitchen while they were arguing. Shortly thereafter, Jourdan came into the kitchen and intervened in the argument. Jourdan and Karon started pushing each other. Jourdan, who had been formally trained in martial arts, eventually subdued Karon on the washing machine. When Jourdan released Karon, Karon allegedly went to his bedroom and took out his gun. Jourdan testified that Karon stood in the doorway to his bedroom and told Jourdan that he "had something" for him and to "just cross the doorstep." Janine and Jourdan decided to take the children and leave the *150 house for awhile. Jourdan and Janine dressed the three younger children, packed some clothes and went to the car. When they realized Brandy was still in the house, Jourdan returned to get her. While Jourdan was in the house, Brandy came outside. Shortly thereafter, Janine heard a gunshot. Janine told Brandy to stay with the children. She was entering the house as Karon left and testified that he stated "He made me do it. I had to do it." When she went inside the house, she saw Jourdan lying on the floor across the hallway. She found a knife on the floor near the victim. Janine called 911 and went with Jourdan to the hospital.
Brandy Bechet, Janine Wilson's fifteen-year-old daughter, testified that after her uncle and Jourdan fought in the kitchen, her mother and Jourdan decided to take her and the children and leave the house. Janine and Jourdan began to dress the younger children and get them ready to go. Brandy was in her room packing clothes. Karon was walking back and forth through the house. After she finished packing, Brandy went to the bathroom. In the meantime, her mother and stepfather had taken the children out to the car. Brandy returned to her room to get her purse and bag. Jourdan came back into the house. Karon and Jourdan started arguing again. Karon was in his bedroom and Jourdan was in Brandy's bedroom. Karon and Jourdan were still arguing when she left the house. Brandy testified that she did not see Karon carrying or holding anything. While she was outside, Brandy heard a gunshot. She ran to the car and stayed with the children while her mother ran inside the house. Brandy went inside the house after her uncle left. Brandy testified that she never saw her uncle carrying a gun.
New Orleans Police Officer Joseph Jones responded to the 911 call. When he arrived on the scene, Janine Wilson stated that her husband, who was inside the house, had been shot. When the officer entered the residence, he observed the victim lying on the floor in the hallway. The victim had been shot in the head. A spent casing was found on the scene. The officer did not observe a knife or any other type of weapon near the victim.
Dr. Gerilyn Metoyer Thompson, Janine and Karon's sister, stated that she spoke with Janine the day after the incident. According to the witness, Janine had found a knife at the victim's feet. Janine told her sister the police picked up the knife and placed it on the washing machine. The police asked her if the knife was involved. She told them she did not know. Dr. Thompson further testified concerning her's sister veracity. She stated that Janine was not a truthful person and would color the truth to suit her purposes. Dr. Thompson stated that she would not lie to protect her brother, Karon. The witness further stated she spoke with the neurosurgeon who operated on the victim. The neurosurgeon told her the entrance wound was at the top of the head and the exit wound was on the neck.
Dr. Ian Angel, chief neurosurgery resident at Charity Hospital, performed a craniotomy on Jourdan Wilson. Dr. Angel testified the gunshot wound was at very close range. There were powder burns on the left side of Wilson's neck. He stated that the entrance wound was on the neck and the exit wound was near the top of the skull in the back of the head. The surgeon found bullet fragments in the soft tissues of the skull.
Jourdan Wilson testified that he and Karon Metoyer were involved in an argument which escalated into a physical altercation. Jourdan eventually subdued Karon and told him to "cool it." Jourdan then followed Karon into his bedroom. Karon took out his gun and told Jourdan to "come here. I'll show you. I've got something for you." Janine decided to get the children dressed and leave the house. When Jourdan and Janine got to the car with the younger children, they realized Brandy was still inside the house. Jourdan went back into the house to get Brandy. When he walked into the house, he heard Karon and Brandy arguing. Jourdan then began arguing with Karon. While they were arguing, Brandy left the house unbeknownst to Jourdan. After his argument with Karon, Jourdan looked for Brandy. Jourdan did not hear Karon's voice anymore and decided to leave. As he turned to go, Karon shot him in the neck. He could feel the gun behind his head. Jourdan asked *151 Karon for help but Karon left. Jourdan did not recall pulling a knife on Karon.
Rene Metoyer trained in the martial arts with Jourdan Wilson for three years. Metoyer stated that Jourdan is known to be a violent person. Metoyer testified that he had discussed Jourdan's violent nature with Janine. August Metoyer and Kenneth Metoyer, Karon and Janine's brothers, testified that Jourdan had a reputation for violence and untruthfulness. In fact, August stated he heard Jourdan threaten other people. August and Kenneth further stated that Janine did not have a reputation for truthfulness. Karon, however, was considered an honest and non-violent person.
Stephanie Williams has known the Metoyer family for twenty years. Ms. Williams assisted Janine in cleaning the house two days after the shooting incident. While they were cleaning, Janine noticed a knife on the washing machine. She told Ms. Williams she wondered why the police had not taken the knife. Janine indicated she had found the knife on the floor near the floor furnace on the day of the shooting.
Karon Metoyer stated that he was arguing with his sister in the kitchen when Jourdan intervened in the argument. Jourdan told him to "shut the F___ up. He had no right to scream at Janine." Karon told Jourdan it was none of his business. He further stated that Jourdan had no business being in the house. Jourdan then went after him, grabbed him and pinned him against the washing machine. After several seconds, Karon pushed Jourdan off of him and slammed Jourdan against the door, causing the door to come off the hinges. Karon then went into his bedroom. Jourdan said "Let's take this outside. I'll kick your ass outside." Karon told Jourdan he was not going outside and to leave him alone.
During this time, Janine was in the back of the house dressing the younger children. Janine and Jourdan took the children to the car. Karon went to Brandy's room and told Brandy that "all this was not necessary and he would buy her a new pair of pants." Brandy said "Yeah, I know." Karon returned to his bedroom. Brandy walked out of her bedroom and went into the bathroom. Jourdan returned to the house while Karon and Brandy were talking. Jourdan told Brandy to leave and that she did not have to listen to the "bullshit Karon was telling her." Karon returned to his room. Shortly thereafter, he heard the screen door close. Karon looked up and saw Jourdan going into the kitchen. Karon saw Jourdan get a knife out of the dish rack. Karon went to his room, got his gun and cocked it. As Karon was walking into the hallway, Jourdan came at him with the knife. Karon told Jourdan to stop but Jourdan continued walking towards him. Karon had the gun pointed straight out. Jourdan came at Karon and ducked under the gun. When Jourdan ducked under the gun, Karon dropped down with the gun. Jourdan raised his head, hitting the gun barrel, and the gun went off. Jourdan immediately fell. Karon walked back into his bedroom, put the gun on the dresser, panicked and looked for his keys. Janine came back into the house. She was kneeling over Jourdan and told Karon "you shot him." Karon told her that he did not shoot Jourdan. He told Janine that Jourdan came at him with a knife. Karon found his car keys and left. Karon turned himself in to the New Orleans Police Department the next morning. Karon stated that he never had pointed the gun at anyone and did not intend to kill Jourdan. Karon testified that the gun discharged accidently when Jourdan's head hit the weapon.

ERRORS PATENT:
A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR:
In his sole assignment of error, the defendant contends the trial court erred in denying his motion for new trial. Defendant argues that the newly-discovered evidence revealed that he did not have the intent to kill the victim. He contends that the evidence supports his allegation that the gun accidently discharged when the victim hit his head on the gun.
La.C.Cr.P. art. 851 provides the grounds for granting defendant's motion for new trial.
The court, on motion of the defendant, shall grant a new trial whenever:
* * * * * *

*152 (3) New and material evidence that, notwithstanding the exercise of due diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.
In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it would probably have produced a different verdict. The trial court has much discretion in ruling on a motion for new trial. However, if the trial court exercises this discretion arbitrarily and the judgment is unjust, the reviewing court should set aside the judgment and order a new trial. State v. Hammons, 597 So.2d 990 (La.1992); State v. Knapper, 555 So.2d 1335 (La.1990). Furthermore, it is not for the trial judge to weigh the evidence or to determine the guilt or innocence of the defendant; rather, the judge must ascertain whether another jury presented with all the evidence, including the newly discovered evidence, would probably reach a different verdict. Knapper; State v. Prudholm, 446 So.2d 729 (La.1984); State v. Talbot, 408 So.2d 861 (La.1980) (on rehearing).
In the present case, the newly discovered evidence upon which defendant based his motion for new trial was Dr. Angel's operative report. Dr. Angel's report, dictated immediately after surgery, contradicted Dr. Angel's trial testimony concerning the entrance and exit wounds. Both the state and the defendant obtained the victim's medical records from Charity Hospital prior to trial. However, the operative report was not included in the records provided by Charity. Defendant's counsel had been advised prior to trial that Dr. Angel indicated that the entrance wound was on the top of the skull and the exit wound was on the neck. When Dr. Angel testified at trial contradictorily to the information previously obtained, defendant sought to obtain additional medical records from Charity. The operative report was not included in any of the records provided. Defendant hired a nurse who worked in the medical records department at Charity Hospital to locate the missing report. Through the continued efforts of the nurse, the operative report was eventually found on a dictation disk. At the hearing on defendant's motion for new trial, the nurse, Ms. Dorothy Jones, testified about her efforts to locate the operative report.
Dr. Ian Angel also testified at the new trial hearing. Dr. Angel acknowledged that his operative report indicated that the entrance wound was on the top of the head and the exit wound was on the neck, contradicting his trial testimony that the entrance wound was on the neck and the exit wound on the top of the head. Dr. Angel admitted that at trial, he testified from memory. He did not have the operative report. Dr. Angel further testified that the only way a person could be facing away from the weapon and sustain an entrance wound to the head and exit wound to the neck would be in an execution style shooting with the victim kneeling. Otherwise, the victim would have to be facing the weapon.
Dr. Chris Sperry, an expert in forensic pathology, reviewed the victim's medical records, including Dr. Angel's operative report. He testified that the trajectory of the bullet indicates that the bullet was fired parallel to the skull and entered the skull on a tangential angle. Such a trajectory and tangential angle would occur only in an accidental shooting. Dr. Sperry indicated that for such a trajectory and tangential angle to occur, the defendant and the victim had to be facing each other with the victim bent forward somewhat at the waist or with his upper body bent and the face and head facing downwards. Such a position is consistent with the victim moving towards the defendant, dropping his head and hitting the gun causing it to accidently discharge. Dr. Sperry further opined that the evidence was not consistent with the victim's testimony, rather, the evidence was consistent with the defendant's testimony.
Evidence taken at the hearing indicates the defendant has shown that the new evidence *153 was discovered after trial, the failure to discover the evidence at the time of trial was not caused by lack of diligence, and the evidence is material to the issues at trial. Both parties acknowledged that the operative report was not contained in the medical records provided by Charity prior to and during trial. Ms. Jones testified that the operative report was finally located after numerous visits to the medical records department. The evidence is material to the main issue of the trial, namely whether the defendant had the intent to kill the victim. The placement of the entrance and exit wounds supports the defendant's contention that the shooting was accidental. The only questionable criteria is whether the evidence is of such a nature that it would probably have produced a different verdict.
The trial court was of the opinion that the operative report would not change the verdict as the evidence at trial revealed that the defendant was armed with a weapon and the victim was unarmed. The trial court also noted that the defendant had the specific intent to kill when he cocked the gun and aimed it at the victim. However, the defendant argues that the operative report supports his testimony that the gun accidently discharged when the victim lunged at him and the victim struck his head on the weapon.
In order to support a verdict of attempted manslaughter, the state must prove that the defendant had the specific intent to kill. State v. Jones, 94-0187 (La.App. 4 Cir. 8/17/94), 642 So.2d 252. The newly-discovered evidence goes directly to this issue. Drs. Angel and Sperry agree that the injury sustained by the victim most likely occurred while the defendant and the victim were facing each other. Dr. Angel suggests that the injury could have occurred in an execution style shooting. However, such a scenario is inconsistent with both the victim's and the defendant's testimony. Dr. Sperry further testified that given the trajectory of the bullet, the injury could have only occurred through the accidental discharge of the weapon. The experts' testimony is inconsistent with the victim's testimony that the defendant shot him in the neck as he was leaving the house. Jourdan Wilson specifically testified at trial that he could feel the gun against his neck. However, the testimony of Drs. Angel and Sperry support the defendant's contention that the weapon accidentally discharged as the victim approached the defendant and the victim's head hit the barrel of the gun. As the experts' testimony and the operative report support defendant's version of the incident, the finder of fact would probably choose to accept the defendant's testimony over the testimony of Jourdan and Janine Wilson. Additionally, the objective evidence presented in the operative report places Jourdan and Janine Wilson's credibility at issue. Thus, a fact-finder would probably be more willing to accept the defense witnesses' testimony about the knife and violent nature of the victim. In light of such evidence, a fact-finder would probably conclude that the defendant did not have the specific intent to kill the victim. Thus, taking all of the above into consideration, the newly-discovered evidence is of such a nature that the outcome of the trial would most likely have been different had it been presented at trial. The trial court erred when it denied the defendant's motion for new trial.
Accordingly, the defendant's conviction and sentence are vacated and the case is remanded for a new trial.
CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL.