846 So.2d 880 (2003)
STATE of Louisiana
v.
Delmar M. BRADFORD.
No. 2002-KA-1452.
Court of Appeal of Louisiana, Fourth Circuit.
April 23, 2003.
*882 Eddie J. Jordan, Jr., District Attorney, Claire Adriana White, Assistant District Attorney, New Orleans, LA, for the State of Louisiana.
Kevin V. Boshea, New Orleans, LA, for Delmar M. Bradford.
(Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge PATRICIA RIVET MURRAY, Judge DAVID S. GORBATY).
*883 DAVID S. GORBATY, Judge.
Delmar Bradford appeals his conviction and sentence for three counts of second degree murder and one count of attempted second degree murder. For the following reasons, we affirm.
STATEMENT OF CASE:
Delmar Bradford was initially indicted by an Orleans Parish grand jury with three counts of first degree murder in Case Number 402-320. On August 24, 2000, he was reindicted with three counts of second degree murder and one count of attempted second degree murder. On March 21, 2001, a jury found Bradford guilty as charged on all counts. On May 4, 2001, Bradford appeared for sentencing and filed motions for new trial and for judgment of acquittal notwithstanding the verdict. The trial court denied the motions, and the defendant waived all legal delays. The trial court sentenced Bradford to three concurrent terms of life imprisonment, without benefit of parole, and to serve a consecutive term of fifty years at hard labor, without benefit of parole. A motion for appeal was granted.
On March 21, 2002, represented by new counsel, Bradford filed a second motion for new trial. On June 14, 2002, a supplemental and amended motion for new trial was filed. A contradictory hearing on the motion was held the same day. On August 22, 2002, the trial court denied the motion for new trial. This appeal follows.
STATEMENT OF FACT:
On July 5, 1998, at approximately 9:30 p.m., Officer David Dotson and his partner, Officer Melody Young, were dispatched to the scene of a shooting at the intersection of St. Anthony and N. Villere Streets. Dotson observed a vehicle exhibiting multiple gunshots with all the windows shot out. A large crowd of people had gathered outside the vehicle. Two passengers in the rear of the vehicle, Deskanell Davis and Rickey Aufrey, were dead. A third victim in the front seat, Leonard Robins, suffered from multiple gunshot wounds to his upper extremities, but was still alive. Dotson related that Robins was coherent and kept saying that he was not going to die. The officers noticed a trail of blood leading away from the car, which lead Officer Dotson to a fourth victim, William Mims, nearby with a gunshot wound to his hand in an apparent state of shock. The officers acted to preserve the crime scene and awaited arrival of emergency personnel. Leonard Robins subsequently expired from his injuries.
Detective Greg Hamilton was assigned as the lead investigator. He ensured that all bullet casings and bullet fragments were collected at the crime scene.
The only survivor of the shooting, William Mims, was not able to give Detective Hamilton any information as to who was responsible for the shooting. Despite his efforts at interviewing people in the area of the shooting in the coming days, Detective Hamilton was unable to identify any suspects during his investigation until he was informed in late August that a victim of another shooting, Percy Cooper, was a witness.
Percy Cooper testified that on August 23, 1998, he was riding his bicycle to a block party. At the intersection of North Robertson and Pauger Streets, Cooper observed a pickup truck pass with the defendant, Delmar Bradford, in the bed of the truck. The two acknowledged each other, and the truck proceeded around the corner. When Cooper reached the corner of St. Anthony and N. Robertson Streets, he saw Bradford and another individual standing there, and they started firing at him. Bradford was armed with an assault rifle. Cooper fled on the bicycle, but was shot several times and fell. As he lay on *884 the ground, Bradford approached, laughed, and then ran away. Cooper had been shot twice in the arm, in the hand, the hip, and the foot. He was able to get up and hop over to some steps where he sat down. A crowd formed around him. Subsequently, emergency personnel and the police arrived, and Cooper was taken to the hospital.
Detective Carlton Lawless was assigned to the follow up investigation in the shooting of Percy Cooper. He took control of the crime scene from the initial responding officers. Lawless spoke briefly with Percy Cooper at the scene and asked if he knew who shot him. All Cooper could tell him before he was taken to hospital was that it was someone named Delmar, Delmarcus, or Del.
Detective Lawless began locating spent casings at the crime scene. He observed a Ford Taurus with several bullet holes and broken windows. Lawless also observed that a bullet had entered a residence at 1723 N. Robertson Street through a window. The bullet passed through an interior wall and traveled through the common wall into the adjoining residence at 1725 N. Robertson. Lawless directed the crime lab to recover the bullet fragment from the residence as well as another fragment from the doorframe of another house. Numerous shell casings were also recovered from the intersection.
Detective Lawless was familiar with a subject by the name of Delmarcus Smith, and playing a hunch, as he described it, he compiled a photographic lineup depicting the subject and presented it to Cooper at the hospital the next day. Cooper viewed the lineup and informed the detective that the perpetrator was not in the lineup.
Detective Lawless returned to his office and after speaking with several officers including Detective Hamilton, he developed Delmar Bradford as a suspect and compiled a photographic lineup. Detective Hamilton also compiled a photographic lineup depicting Delmar Bradford for use in his investigation of the triple homicide, and the two returned to the hospital where Cooper identified Delmar Bradford as the person who had shot him, as well as the perpetrator of the shooting on July 5, 1998.
Percy Cooper testified that when he spoke to Detective Lawless and Detective Hamilton he revealed that the person who shot him had also been responsible for the previous homicides. Cooper testified that on July 5, 1998, he was walking on St. Anthony Street after leaving a friend's house. He stated that he observed a burgundy car pass him and stop at the next intersection. A green car was parked at the stop sign. Delmar Bradford exited the burgundy vehicle with an assault rifle and began shooting at the green car. Cooper was approximately two houses away at this time. When the shooting started, Cooper ran in the opposite direction. Cooper stated that he recognized Bradford as he had known him previously.
Sgt. Robert Norton testified that he was a member of the team that executed a warrant for Delmar Bradford at 5404 Royal Street. The officers arrived at the home at approximately 4:00 a.m. and were greeted by Bradford's mother. She directed the officers to a bedroom where Bradford was located. Inside a closet in the room, Sgt. Norton located an AK-47 assault rifle and two fully loaded clips of ammunition that were taped together.
Officer Byron Winbush testified as an expert in firearms and firearms examinations. He examined a bullet recovered during the autopsy of Leonard Robins and a bullet recovered during the autopsy of Rickey Aufrey. Winbush stated that they were both 7.62 millimeter bullets, which is *885 the type of ammunition normally used in an AK-47 rifle. By comparing the striations on the bullets he was able to determine that they were both fired from the same weapon. Winbush further examined twenty-three 7.62 millimeter shell casings recovered from the scene of the homicide and was able to determine that twelve of the casings were fired by one weapon and that eleven of the casings were fired by another weapon. Officer Winbush test fired a round from the weapon recovered by Sgt. Norton and made a comparison with the two bullets obtained during the autopsies. He testified that the markings on the test fire bullet were insufficient to render a determination as to whether the two autopsy bullets were fired by the weapon in question. He stated though that in his expert opinion there was an 85% probability that the two bullets were fired from the weapon. Winbush related that the type of weapon made it difficult to make a determination as it has only four lands and grooves in the barrel as opposed to five or six found in a .38 caliber pistol. He stated further that there had been some damage to the barrel of the gun as some of the lands and grooves were overlapping. He explained that the weapon is a poorly manufactured weapon and that repeated firing of the weapon and the failure to clean it will cause wear and tear on the barrel.
Officer Kenneth Leary testified as an expert in firearms examinations. He examined fourteen 7.62 millimeter shell casings recovered from the August 23, 1998, shooting and was able to determine that they were all fired from the same weapon. Another shell casing recovered from the scene exhibited insufficient stria to make a determination. Leary also examined a bullet and copper jacket fragment recovered from the August 23, 1998 shooting and found that they were fired from the same weapon. Finally, Leary also compared shell casings from the two earlier homicides with shell casings recovered at the August 23, 1998 shooting, and was able to match two cartridge cases recovered at the homicide scene to the fourteen cartridge cases recovered at the August 23, 1998 shooting.
ERRORS PATENT:
A review of the record for errors patent reveals none.
ASSIGNMENT OF ERROR NUMBER 1:
Bradford contends that the trial court erred in denying his later filed motion for new trial, which was based on newly discovered evidence, namely Percy Cooper's medical records from Charity Hospital. The medical records contain the results from a urinalysis toxicology screen that indicate the presence of opiates, cocaine, and benzodiazepine. The records also contained information that Cooper was admitted for drug treatment in March, 2000. At trial, the prosecutor asked Cooper whether he was "high or drunk" on the night that he was shot such that his ability to perceive someone would have been affected. Cooper replied that he was not.
To obtain a new trial under La. Code Crim. Proc. art. 851(3), the defendant has the burden of showing: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of the trial was not caused by the lack of diligence; (3) the evidence is material to the issues at trial; and, (4) the evidence is of such a nature that it would probably have changed the verdict. State v. Hammons, 597 So.2d 990 (La.1992); State v. Metoyer, 97-2266 (La.App. 4 Cir. 10/7/98), 720 So.2d 148.
The testimony from the hearing on the motion for new trial reflects that on the morning of trial defense counsel made *886 an oral motion to continue the trial based in part on the need to obtain Cooper's medical records. The trial court denied the motion, but issued a subpoena duces tecum to the custodian of medical records at the Medical Center of Louisiana. From the record, it is apparent that the records were produced on April 7, 2001. The trial court denied the motion for new trial on the basis that the evidence "could have been obtained or sought prior to the trial." The court's ruling was clearly correct.
In State v. Metoyer, supra, this Court found that counsel's failure to obtain an operative report, which was not included in the medical records initially produced by the hospital, was not caused by lack of diligence. The report was located only after numerous visits to the medical records department by a private nurse hired to search for the report. By contrast, Bradford's counsel's only effort to obtain the records did not commence until the day of trial. The trial court properly denied the motion.
In passing, Bradford further alleges that the failure of the prosecution to obtain the medical records and produce them by way of its Brady obligation amounts to a Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490, (1995) violation. Bradford raised this issue in his motion for new trial.[1]
Kyles was a post-conviction case involving the application of the well-established Brady rule that the prosecution's failure to disclose exculpatory material justifies a new trial, regardless of whether that failure is in good faith or bad faith. Kyles, 514 U.S. at 437-38, 115 S.Ct. at 1567. Rejecting the argument of the State of Louisiana that Brady's requirement of a new trial should not apply in circumstances where the evidence is known only to police and not to the prosecutor, the Court stated that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id.
Bradford's discussion of Kyles is simply that the State bore the burden of producing the aforementioned records. The argument assumes, notably without citation or authority, that the prosecution's duty to learn of any favorable evidence extends beyond the boundaries of others acting on the government's behalf in the case, including the police, to a state-funded hospital. We do not find that Kyles creates such a duty, especially in the absence of argument to the contrary. Whatever the exact parameters of Kyles may be, they clearly do not extend to an institution, albeit a state-funded institution, whose primary mission is the care and treatment of the sick and injured, and not tied to the judicial system.
ASSIGNMENT OF ERROR NUMBER 2:
By this assignment Bradford argues that his conviction should be reversed on the ground of an improperly constituted grand jury. He contends that the procedure utilized in Orleans Parish for selecting the grand jury foreman resulted in the substantial under-representation of African-Americans as grand jury foremen. Bradford contends that because the foreman of the grand jury that issued the indictment was selected in a discriminatory manner he is entitled to relief pursuant to the Fourteenth Amendment. However, the record on appeal shows that Bradford *887 failed to move to quash the grand jury indictment. Because this issue is raised for the first time on appeal, Bradford has failed to preserve the claim for review.
In Deloch v. Whitley, 96-1901 (La.11/22/96), 684 So.2d 349, the Louisiana Supreme Court made clear that an equal protection claim based upon discriminatory selection of the grand jury foreman is barred if the defendant fails to file a pretrial motion to quash saying:

All equal protection claims arising out of the selection or composition of grand juries in Louisiana remain subject to this state's procedural requirements. Francis v. Henderson, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). Counsel must assert the equal protection claim in a pre-trial motion to quash or waive any complaint in that regard. Francis, 425 U.S. at 539-542, 96 S.Ct. at 1710-11; State v. Lee, 340 So.2d 180, 182 (La.1976) (motion to quash is the appropriate vehicle for challenging the validity of a grand jury indictment, composition, or selection process); State v. Dillard, 320 So.2d 116, 120 (La.1975) (failure to file a motion to quash before trial waives any challenge to the grand jury); State v. White, 193 La. 775, 192 So. 345, 348 (1939) (same); cf., Johnson v. Puckett, 929 F.2d 1067, 1069 (5th Cir.1991) ("At his trial, Johnson, a black male, moved to quash the indictment because of racial discrimination in the selection of the grand jury foreman but the motion was denied."); Guice v. Fortenberry, 661 F.2d 496, 501, n. 7 (5th Cir.1981) (same), appeal after remand, 722 F.2d 276 (5th Cir.1984).
Id.
Apparently cognizant that his claim is procedurally barred from review, Bradford argues that trial counsel was ineffective for failing to raise the equal protection claim prior to trial. In general, a defendant asserting an ineffective assistance of counsel claim must demonstrate that counsel's performance was deficient and also that this deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Citing U.S. v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) defendant avers that he need not demonstrate prejudice, as the failure to move to quash the indictment was a constructive denial of counsel and prejudice should be presumed. In Cronic, decided the same day as Strickland v. Washington, the Supreme Court created a very limited exception to the application of Strickland's two-part test in situations that "are so likely to prejudice the accused that the cost of litigating their effect in the particular case is unjustified." Cronic, 466 U.S. at 658, 104 S.Ct. at 2046. The Supreme Court identified three situations implicating the right to counsel where prejudice will be presumed. First are situations in which a defendant petitioner is denied counsel at a critical stage of a criminal proceeding (complete denial of counsel). Second, and the most relevant here, are situations in which a defendant's trial counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." Cronic, 466 U.S. at 659, 104 S.Ct. at 2047. Finally, prejudice is presumed when the circumstances surrounding a trial prevent a petitioner's attorney from rendering effective assistance of counsel. Cronic, 466 U.S. at 659-660, 104 S.Ct. at 2047. (citing Powell v. Alabama, 287 U.S. 45, 57-58, 53 S.Ct. 55, 77 L.Ed. 158 (1932)).[2]
In Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), the *888 Supreme Court clarified the scope of the Cronic exception to Strickland with regard to the failure to test the prosecution's case. The Court reiterated that the failure must be "complete," and is only applicable when "`counsel entirely fails to subject the prosecution's case to meaningful adversarial testing.'" 535 U.S. at 685, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039.) (Emphasis added.) Here, Bradford's argument is not that his counsel failed to oppose the prosecution as a whole, but at a specific point. Accordingly, the claim must be analyzed according to Strickland's performance and prejudice components where defendant must overcome the "presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S.Ct. at 2052. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The failure to file a motion to quash, which as here, would likely lead only to re-indictment, can properly be assigned to "trial strategy." See State v. Hoffman, 98-3118, p. 38 (La.4/11/00), 768 So.2d 542, 577 (counsel's decisions as to which motions to file form a part of trial strategy); State v. Smith, 94-0621 (La.App. 4 Cir. 12/15/94), 647 So.2d 1321, rev'd on other grounds, 95-0061 (La.7/2/96), 676 So.2d 1068. Furthermore, under these circumstances, where a new indictment could have led to the reinstitution of first-degree murder charges, the decision to seek a new indictment could well be faulted in its own right.
ASSIGNMENT OF ERROR NUMBER 3:
Bradford alleges that he was prejudiced by a reference to his post-arrest silence in contravention of the rule established in Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). During the testimony of Detective Hamilton he was asked whether he was present when Bradford was apprehended and he responded as follows:
I was notified at, man, probably was three something in the morning when this person was apprehended and taken to the Fifth District Police Station where I there went to the police station to meet with him, advise him of his rights, his charges, asked him if he wanted to make any statements. At that point he did not want to make any statements to me.
In Doyle v. Ohio, the United States Supreme Court addressed the issue of whether a prosecutor could seek to impeach a defendant's exculpatory account, offered for the first time at trial, through his failure to offer the statement at the time of his arrest after receiving Miranda warnings. The Court held that the use, for impeachment purposes, of a defendant's silence after receiving Miranda warnings at the time of arrest, violates the Due Process Clause of the Fourteenth Amendment.
The record reflects that no objection was offered by defense counsel to the complained of statement by Detective Hamilton. As such the alleged error was not preserved for appellate review. La Code Crim. Proc. art. 841; State v. Trackling, 598 So.2d 615 (La.App. 4 Cir.1992), rev'd in part on other grounds, 609 So.2d 206 (La.1992). Furthermore, the argument lacks merit. Doyle prohibits the use of an accused's exercise of his constitutional *889 right to remain silent to undermine exculpatory testimony by the defendant offered for the first time at trial, e.g., State v. Grant, 99-1065 (La.App. 5 Cir. 1/25/00), 761 So.2d 10. Here there is no indication of an attempt to exploit Bradford's post-arrest silence, and the officer's statement appears to be a simple "description of how the police investigation culminated in the formal arrest of the defendant with the routine incidents of custody, e.g., the reading of Miranda warnings to the person arrested." State v. George 95-0110, p. 10 (La.10/16/95), 661 So.2d 975, 980.
ASSIGNMENT OF ERROR NUMBER 4:
Bradford contends that he received ineffective assistance of counsel at trial and raises several instances, which he claims demonstrate that his trial attorney was not functioning as the "counsel" guaranteed him by the Sixth Amendment.
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Johnson, 557 So.2d 1030 (La.App. 4 Cir.1990). Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issues on appeal. State v. Seiss, 428 So.2d 444 (La.1983); State v. Landry, 499 So.2d 1320 (La.App. 4 Cir. 1986).
A defendant's claim of ineffective assistance of counsel is to be assessed by a two-part test: the defendant must show that counsel's performance was deficient and that the deficiency prejudiced defendant. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Fuller, 454 So.2d 119 (La.1984). Counsel's performance is ineffective when it can be shown that he made errors so serious that counsel was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 697, 104 S.Ct. at 2068. The defendant must make both showings to prove that counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir.1992).
Bradford begins his discussion by noting several "objectionable instances" of trial counsel's purported deficient performance under the heading of "Discovery." He notes that the State provided purportedly "late discovery" on the morning of trial and that defense counsel moved for a continuance on this basis. Bradford states that "[t]his (in reference to the late discovery) is most important because during the trial, counsel for the defendant is issuing instanter subpoenas for witnesses, Ronald Wilson and Damon Albert." Bradford fails to elaborate on this "important" correlation between the discovery and the need to issue subpoenas. However, the clear implication is that the identity of these two witnesses was only realized after obtaining the discovery material. The State's supplemental answers to discovery reflect that the material provided on the day of trial consisted of Percy Cooper's typed statement to police and Officer Leary's crime lab report. Neither of these two documents identifies Ronald Wilson or *890 Damon Albert as potential trial witnesses. In any case, it is difficult to ascribe any relevance of the timeliness of the State's discovery responses to a claim of ineffective assistance of counsel.
Bradford also notes, "[w]hy counsel is issuing subpoenas for witnesses in the middle of a multiple victim Second Degree trial is not clear." His apparent suggestion is that counsel was ineffective in this regard. However, as Bradford himself recognizes, the record here is clearly insufficient to assess either element of the Strickland analysis in this regard. The answer to the question and any discussion of the issue must therefore be left for post-conviction relief.
Bradford also claims through appellate counsel that he received ineffective assistance of counsel because his trial counsel did not make a sufficient effort to procure Percy Cooper's medical records prior to trial. To some degree, the testimony of defense counsel at the hearing on the motion for new trial answers appellate counsel's question. Trial counsel testified that he had assumed that the State had obtained Percy Cooper's medical records and would introduce them at trial to establish the extent and nature of his injuries. Such evidence would be important to satisfy the elements of second-degree murder. Counsel also testified that he recalled that the trial court had ordered the prosecution to obtain the records. Finally, counsel admitted that he telephoned the prosecutor the night before trial in an effort to locate the medical records.
Bradford notes that the records would have served as a valuable tool to impeach the witness's testimony. However, as the U.S. Supreme Court cautioned, [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. In this case, the relative significance of the medical records only became apparent once the results of the toxicology screen were known. Absent a showing of some prior knowledge of the contents of the records, judging the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, this Court cannot say that counsel's failure to obtain the records fell outside [the] wide range of professionally competent assistance. 466 U.S. at 690, 104 S.Ct. at 2066.
Bradford also observes that defense counsel did not object after the trial court granted the State's motion in limine to exclude any reference to the arrest or conviction of Officer George Lee who was present at the time of Bradford's arrest.[3] Other than note that criminal convictions are admissible against a witness at trial, Bradford does not suggest that the court's ruling was improper or the basis for any objection or argument that trial counsel should have raised. As the State notes, it has not been alleged that Lee played a significant role in the development of the case or apprehension of Bradford; furthermore, he did not testify, and any gratuitous references to his criminal convictions would have been irrelevant and inadmissible. When the substantive issue an attorney failed to raise has no merit, then the claim the attorney was ineffective for failing to raise the issue also *891 has no merit. See State v. Williams, 613 So.2d 252, 256-57 (La.App. 1 Cir.1992).
Part II of defendant's assignment of error, entitled "Mistrial" centers on alleged instances of the introduction of other crimes evidence. Generally, evidence of other crimes, wrongs, or acts committed by the defendant is inadmissible. See La. Code Crim. Proc. art. 770(2), 770. In State v. Edwards, 97-1797, p. 20 (La.7/2/99), 750 So.2d 893, 906, the Louisiana Supreme Court summarized the jurisprudence as follows:
Potentially damaging remarks include reference to race or religion, when not material or relevant to the case, and direct or indirect reference to another crime committed or alleged to be committed by the defendant, unless that evidence is otherwise admissible. La.Code Crim. P. art. 770. The comment must be within earshot of the jury and must be made by a judge, district attorney, or other court official. Id. Comments must be viewed in light of the context in which they are made. State v. Webb, 419 So.2d 436, 440 (La.1982). Moreover, a comment must not "arguably" point to a prior crime; to trigger mandatory mistrial pursuant to Article 770(2), the remark must "unmistakably" point to evidence of another crime. State v. Babin, 336 So.2d 780 (La.1976) (where reference to a "mug shot" was not unmistakable reference to a crime committed by defendant); State v. Harris, 258 La. 720, 247 So.2d 847 (1971) (where no crime was evidenced by a police officer's reference to obtaining defendant's photograph from the Bureau of Investigation). In addition, the imputation must "unambiguously" point to defendant. State v. Edwards, 406 So.2d 1331, 1349 (La.1981), cert. denied sub nom. Edwards v. La., 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). The defendant has the burden of proving that a mistrial is warranted. See State v. May, 362 So.2d 516 (La.1978).
The first purported instance occurred during the testimony of Officer Melody Young. She was one of the first officers on the scene of the first shooting and she was able to speak with Leonard Robins before he expired. The defense questioning was as follows:
Q. Now, you said or described that you had conversation with one of the deceased who wasstill remained alive at the scene, correct?
A. Yes, sir.
Q. That person did not tell you that Delmar Bradford was the shooter?
A. He did not call a name.
By Mr. Milner: We would object. That's hearsay, Your Honor.
By the Court: Overruled.
Q. Did he identify Delmar Bradford as being a shooter?
A. He said he tried to kill me before, he's not going to kill me, I'm not going to die.
Q. But he did not tell you who that person was?
A. No, sir.
Q. Did you ask him?
A. Yes, I did.
Q. Did he refuse to give you a name or did he just not
A. It's like, I'm going to handle it, I'm not going to die. That was it.
The highlighted portion of the testimony represents the purported other crimes reference. Bradford contends that trial counsel's failure to object to the statement or request a mistrial constitutes ineffective assistance of counsel. The officer's testimony referenced a comment by a dying man that "he tried to kill me before." The officer repeated the alleged comment in *892 answer to a question about whether the victim identified Bradford as the shooter. The comment was not an unambiguous reference to another crime committed by this particular defendant. Further, the comment was not made by the judge, the district attorney or other court official. Counsel was not deficient for failing to object or request a mistrial, and Bradford did not suffer any prejudice by the failure of his trial counsel to do so.
The second instance of an alleged reference to other crimes came during the direct examination of Detective Hamilton:
Q. Okay. Did you eventuallydid you have a break in the case?
A. Yes I did. I mean, I thought I was going to have something sooner but I must say, as my case was happening, as I was out investigating people were said they're going to talk to me later, I was waiting on information that never came. After this particular car, those photographs you seen, it was in the news that this car was part of or as they advertised and talk about again that we, the New Orleans Police arrested the Seventh Ward Soldiers, that car was shown at the time and that this arrest was made on the Seventh Ward soldiers. So I take it that people assume my
By Mr. Boyer: Objection, Judge, this is all speculation.
By The Court: Sustained.
By Mr. Boyer: I don't know where this is coming from.
Q. Well
A. Well I guess the point I make is that my investigation cut off after that car was shown on TV.
Q. Okay.
By Mr. Boyer: Judge I'm going to move that that testimony about the Seventh Ward Soldiers and that be stricken. I mean, there's no basis in fact for any of that. I don't know where that comes from.
By the Court: Approach the bench.
By Mr. Milner: I'll do better than that, Judge. I mean, I'll do better than that with the witness if Mr. Boyer will let me.
By the Court: I don't know what that means. Approach the bench.
Bench Conference Ensues
Examination by Mr. Milner: Now this case didn't have anything to do with Seventh Ward Soldiers' case, did it?
A. No it did not.
Q. Okay.
By the Court: All right ladies and gentlemen
By the witness: To my input I have no knowledge that it had anything to do with the Seventh Ward Soldiers other than the vehicle was shown in the news, on the media of that vehicle, that I showed you pictures of there.
By the Court: Mr. Boyer, do you have a motion?
By Mr. Boyer: Yes, Judge I would ask that you admonish the jury that that testimony regarding the soldiers and whatever connection that can be drawn be stricken from the record and act like it never occurred.
By the Court: All right ladies and gentleman, the Defense had movedmotion is granted. The Defense has moved for an admonition to the jury to have that testimony that you just heard about the car and the Seventh Ward Soldiers, although there is no connection there as the detective just testified, I am ordering that that be stricken from the testimony. You are to not factor that into your deliberations. You are to disregard that testimony as if it never happened.
*893 The following morning, defense counsel moved for a mistrial which the court denied.
Bradford alleges that trial counsel was ineffective for failing to request a mistrial initially, rather than waiting until the following day. Again, Bradford presents no argument as to why the delay in seeking a mistrial was faulty, or failed to preserve the error. In any case, plainly, the reference to the Seventh Ward Soldiers was unnecessary as it bore little relevance to the case; and, as made clear by the officer, there was no connection between the Seventh Ward Soldiers and the instant case other than the fact that video of the car had been mistakenly broadcast on television in association with another case. The trial court's admonition which both emphasized this fact and which instructed the jury to disregard the testimony was clearly sufficient to correct any potential for prejudice. Accordingly, the trial court's denial of the mistrial was not in error, and counsel's performance was neither deficient in this regard nor was there any prejudice to the defendant.
Bradford contends further that counsel's failure to object or request a mistrial in response to the alleged Doyle violation during Detective Hamilton's testimony supports a finding of ineffective assistance of counsel. As discussed in Assignment of Error No. 2, Detective Hamilton's brief mention of Bradford's post-arrest silence was not in violation of Doyle v. Ohio.
Bradford also alleges that his trial counsel was delinquent in failing to request a mistrial following an incident at the conclusion of the first day of trial. Apparently, as the jury was exiting the courtroom, they were followed out by several members of the audience who were either the defendant's or the victims' family members. Furthermore, it appears that there was some concern over something on the evening news or in the newspaper related to the trial. Before trial commenced on the second day, the trial judge spoke with each of the jurors separately in chambers with all counsel present to assess whether anyone had been intimidated or frightened and whether anyone had seen or read anything about the case.
A mistrial may be declared when "prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." La.Code Crim. Proc. art. 775. Mistrial is a drastic remedy and proper only when misconduct deprives the defendant of any reasonable expectation of a fair trial. State v. Miller, 93-1096 (La.App. 4 Cir. 5/17/94), 637 So.2d 1115. A decision on whether prejudice has resulted lies in the sound discretion of the trial judge. State v. Allen, 94-1895 (La. App. 4 Cir. 9/15/95), 661 So.2d 1078.
As evidence that the jury had been "compromised" by the incident, Bradford points to the statements of Juror Domaine when questioned by the trial judge.
Q. Good morning, Ms. Domaine, how are you doing?
A. All right. How are you?
Q. I'm doing fine thanks. I'm calling back each of the jurors and asking them the same questions. And that is, did you watch any TV last night?
A. No.
Q. Read any newspapers?
A. No.
Q. And did anything happen during yesterday's proceedings that you feel influences you one way or the other?
A. Just that the people that was in theout in the courtroom followed us out. You know, they came out just when we came out.
Q. Last night or earlier?
*894 A. Last night. They were just standing there. You know, that's the only thing. Other than that I'm fine.
Q. Okay does that influence you one way or the other?
A. No. I just felt a little uncomfortable that they came out the same time we did. Last night when we, you know
Q. When we adjourned for the night.
A. The first time.
Q. Before that?
A. Yeah.
Q. Okay. Before.
A. And you rectified that. But that was the only thing.
Q. And you feel you could be a fair and impartial juror in this case?
A. Yeah, uh-huh.
Q. All right. Great. Thank you so much, Ms. Domaine, we're going to start in a minute.
As is evident from the colloquy, Juror Domaine was not affected by the incident. The eleven other jurors likewise stated that the incident did not affect their ability to be fair and impartial.
Bradford also points to a comment by Juror Hadley. The trial court asked him, "Did anything happen during yesterday's court proceedings that you feel influences you one way or the other in the case?" Mr. Hadley responded, "The information we received so far." Bradford alleges that the statement demonstrates that the juror had already made up his mind. Certainly any juror would be influenced by the information received in a trial, and the statement does not indicate that the juror was predisposed in one direction or the other.
In further support of the argument that trial counsel should have requested a mistrial, Bradford notes the statement by Juror Smith. The juror's exchange with the trial court was as follows:
Q.... And Ms. Smith, I wanted to ask you too, did anything happen during the trial yesterday or yesterday evening that you felt influenced you in any way or would prevent you from being a fair and impartial juror?
A. No.
Q. Okay. Everything's okay?
A. Everything is okay. I think I can be pretty fair. But I think unless the young man talks
Q. That is up to his lawyer. That's up to his lawyer,
A. Oh, okay. I'll be, you know a good juror either way.
A. All right. Good. Thank you so much.
Bradford contends that the statements reflect that "Ms. Smith believed that the burden of proof, to some degree, was upon Delmar Bradford to establish his innocence." The juror was not traversed as to the meaning of her statement. Indeed, her statement was cut short by the trial court, and, subsequently she stated essentially that she would be "fair either way." She did not state that she would be prejudiced against Bradford if he did not testify or that she could not fairly and impartially apply the law based on the evidence adduced at trial. Accordingly, there was no basis for requesting a mistrial.
Finally, Bradford suggests essentially that trial counsel was ineffective for failing to develop a winning trial strategy.[4] However, *895 Bradford does not give any examples of "winning" strategies. Furthermore, as aptly stated by the First Circuit Court of Appeal:
Under our adversary system, once a defendant has the assistance of counsel, the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney. State v. Felde, 422 So.2d 370, 393 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983). The fact that a particular strategy is unsuccessful does not establish ineffective assistance of counsel. State v. Felde, 422 So.2d at 393.
State v. Folse (La.App. 1 Cir.1993), 623 So.2d 59, 71.
CONCLUSION:
Accordingly, for the reasons assigned above, we affirm the conviction and sentence.
AFFIRMED.
NOTES
[1] At the hearing on the motion for new trial counsel specifically withdrew defendant's previous motion which had raised a claim under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as a basis for new trial, noting that there was no indication that the State had obtained the records prior to trial.
[2] In Powell, the defense attorney was given a day to prepare for trial, a circumstance which the Court found "made it so unlikely that any lawyer could provide effective assistance that ineffectiveness was properly presumed without inquiry into actual performance at trial." Id., 104 S.Ct. at 2048.
[3] Officer George Lee was convicted of multiple counts of forcible rape and second degree kidnapping in case no. 414-519 "K" in Orleans Parish Criminal District Court. The case is docketed on appeal in case number 2002-KA-1793.
[4] Bradford also notes that the record does not reflect that trial counsel filed any discovery motions. However, the testimony from the motion for new trial reflects that trial counsel filed discovery motions under the previous case number. They are therefore not contained in the record before the Court. Bradford also raises the issue of counsel's failure to file a motion to quash the indictment as a basis for alleging that his trial counsel rendered ineffective assistance of counsel under Strickland v. Washington. That issue was fully discussed with respect to Assignment of Error No. 2.